INLAND CITIES EXPRESS, INC.,
Plaintiff-Appellant,

v.

DIAMOND NATIONAL
CORPORATION,
Defendant-Appellee.

No. 73–3050.

United States Court of Appeals,
Ninth Circuit.

Oct. 14, 1975.

L. A. Newlan, Jr. (argued), of Lund & Newlan, Beverly Hills, Cal., for plaintiff-appellant.

G. William Shea (argued), of McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for defendant-appellee.

## OPINION

Before TUTTLE,[*] HUFSTEDLER and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

Inland Cities Express, Inc. (Inland) operates a trucking service pursuant to a highway contract carrier's permit granted by the California Public Utilities Commission (PUC). Diamond National Corporation (Diamond) manufactures paper products and has a plant in Red Bluff, California. From 1967 until 1972, Diamond did its shipping from its Red Bluff plant to consignees in California with Inland. Following the termination of their business relationship, Inland brought this action to recover $500,000 in undercharges allegedly resulting from improperly invoked exceptions to the governing tariff regulations. Jurisdiction in the district court was founded upon diversity of citizenship. The trial court granted summary judgment for Diamond and Inland appeals. We affirm.

### I

The intrastate transportation of property for compensation by motor carriers in California is controlled by a legislative scheme of regulations and tariffs. Under Cal. Public Utilities Code sections 3662 and 3665, the PUC has promulgated minimum rate structures for different kinds of commercial transportation available in California.

■ Inland calculated its tariff rates under Minimum Rate Tariff No. 2 (MRT No. 2). MRT No. 2 has standard rates, but also contains exceptions, listed in different "items" in the tariff, that permit the carrier to treat related separate shipments or unrelated combined shipments as a single shipment at a special rate. The purpose of these exceptions is to allow motor carriers more flexibility in their operations. *Gem Freight Lines,* 61 Cal.P.U.C. 411, 413 (1963).

The two exceptions relevant to this case are those for split-delivery and multiple-lot shipments. In a split-delivery shipment, freight loaded on one trailer is intended for more than one point of destination. In a multiple-lot shipment, more than one trailer is used to carry freight from the point of origin to the point of destination, enabling the carrier to transport one shipment of freight in more than one physical movement. The question in this case is whether Diamond complied with the split-delivery and multiple-lot shipment regulations in MRT No. 2 in its day-to-day shipping with Inland. The district court held that it did and, therefore, properly received the special rates.

■ Because we are reviewing a summary judgment, we need decide only whether any genuine issue of material fact remains for trial and whether the substantive law was correctly applied. *Vickery v. Fisher Governor Co.,* 417 F.2d 466, 468 (9th Cir. 1969). Viewed in that light, the record shows that the parties engaged in the following practices:

In the morning at Diamond's loading dock in Red Bluff, Inland's hostler would receive tally sheets prepared by Diamond. Each tally sheet represented one shipment for one consignee and stated the kinds of goods to be shipped, the total number of bundles for each kind, the order number and the identity of the consignee. Inland verified the number of bundles involved and filled in the trailer number.

When the driver arrived, the freight to be included in the day's shipment often had not yet been located. If Diamond received emergency orders from consignees, the shipping order would be changed while the trailers were being loaded.

[*] Honorable Elbert P. Tuttle, Senior United States Circuit Judge, Fifth Circuit, sitting by designation.

Inland's hostler would direct the loading process. As each trailer was loaded, the hostler prepared a loading diagram of the trailer so the driver could easily locate at each stop the freight designated for that stop. Finally, once the trailers were loaded, Diamond issued a master bill of lading. The master bill of lading referred to each shipment and listed the total numbers and kinds of packages, the total weight of the items listed on the tally sheets and a description of the articles. When more than one trailer was covered by the master bill of lading, the first trailers that had been loaded would leave the dock before the loading of the later trailers had been completed, so that the master bill of lading was not prepared until some trailers covered by it had departed. The master bill of lading was the first single document which covered the entire shipping transaction.

## II

The applicable regulations in MRT No. 2 are Items 85 and 172. Item 85(a) governs the rates for multiple-lot shipments. It spells out the conditions that must be met in order for "[t]he separate pickups made in accordance with the foregoing provisions [to] constitute a composite shipment which shall be subject to the rates . . . for the transportation of a single shipment . . . ." Item 85(a)(5). Item 85(b) warns that:

> If any of the property described in the single multiple lot document is picked up without complying with the foregoing provisions, each such pickup shall be rated as a separate shipment under other provisions of this tariff.

Item 172 applies to split-delivery shipments and contains a similar warning:

> If [the requirements of Item 172 are not complied with], each component part of the split delivery shipment shall be rated as a separate shipment under other provisions of this tariff.

Diamond was charged at the combination rates permitted by compliance with Items 85 and 172. Inland now claims that Diamond's multiple-lot and split-delivery shipments should have been charged as separate shipments rather than as combination shipments, because of noncompliance with the availability and documentation requirements of the tariff.

### A. Availability

■ Item 85(a)(1) requires that in a multiple-lot shipment "the entire shipment shall be available to the carrier for immediate transportation at the time of the first pickup." Inland alleges a violation of this requirement for the first time on appeal. Although unavailability is alleged in the complaint, how it came to be there is illuminating and, we believe, critical.

At the hearing on the motion for summary judgment, Inland requested permission to make an oral amendment to its complaint, although it previously had not served notice in accordance with a local rule. The proposed amendment was stated but the record demonstrates that no allegation was made to the effect that Diamond had not complied with the availability requirement. When Diamond stipulated that the amendment contained no surprise or prejudice, the district court granted leave to amend. The availability issue was not at that time an issue in the case, was not argued before the court and, naturally, was not addressed in the court's findings of fact and conclusions of law. Yet, in its formal written amendment filed after judgment, Inland alleged violation of the availability requirement.

We refuse to consider the availability issue. The written amendment did not conform to the oral amendment allowed by the district court. The issue was never presented to the district judge and he had no opportunity to rule upon it.

### B. Documentation

Three documentation requirements are found in Items 85 and 172: first, a single multiple-lot document covering the entire shipment issue by the carrier or shipper prior to or at the time of the

initial pickup (85(a)(3)); second, a written document issued by the shipper prior to or at the time of the initial pickup describing the kind and quantity of property in each component part of the total shipment (85(a)(2) and 172(2)); and third, a master bill of lading (172(2) and (3)).

 The purpose of the single multiple-lot document in Item 85(a)(3) is to assist the carrier in proving and the PUC in verifying, usually long after transportation movements have occurred, that the multiple lots are initially intended to be a single shipment. As the PUC has stated:

> To safeguard against abuse of these rules, the documentation requirements were promulgated. Essentially they require the consignor to identify, prior to shipment, the goods that he intends to tender for transportation. This requirement was designed to guard against loose arrangements and vague or incomplete instructions; otherwise the consignor would have time to forward shipping instructions (for the lower rate) as his needs arise rather than as part of the single transaction contemplated by the rules.

*Gem Freight Lines, supra,* 61 Cal.P.U.C. at 413; *accord, Landis Morgan,* 66 Cal.P.U.C. 86, 95 (1966).

 Where the purposes served by the documentation requirements are met, the technicalities of documentation cannot defeat a claim to a tariff exception. While the tally sheets did not constitute a "single document," they were sufficient both to safeguard the carrier's pre-shipment intent and to record the transactions. Once Inland's hostler received the tally sheets at the beginning of the first pickup, he had all the information required by Item 85(a)(3). He knew exactly what was intended in the day's shipment and the tally sheets collectively provided a written record from which the shipments could be reconstructed.

The tally sheets were also sufficient to comply with the requirement of Items 172(2) and 85(a)(2) that prior to the initial pickup the carrier receive a written document describing the property in each component part of the split-delivery shipment. The tally sheets listed all the information required by these items.

Finally, the master bill of lading, in setting forth the total numbers and kinds of packages, a description of the articles and the total weight, fulfilled the requirements of Item 172(2) and (3).

We find that the documentation, as a matter of law, did not constitute a violation of the tariff regulations.

Affirmed.