UNITED STATES of America, Plaintiff,

v.

DUNCAN CERAMICS, INC., a
corporation, Defendant.

UNITED STATES of America, Plaintiff,

v.

YELLOW FREIGHT SYSTEM, INC., a
corporation, Defendant.

Crim. Nos. F–77–227 REC, F–77–228
REC.

United States District Court,
E. D. California.

Aug. 16, 1982.

Dean A. Bailey, Fresno, Cal., Theodore W. Russell, Los Angeles, Cal., for Yellow Freight System, Inc.

Donald B. Ayer, U. S. Atty. by James E. White, Asst. U. S. Atty., Robert S. Griswold, Jr. and Barbara J. Welsch, Sp. Asst. U. S. Attys., San Francisco, Cal., Stephen L. Day, Senior Trial Atty., Seattle, Wash., for plaintiff.

Robert G. Carter, Trevor C. Clegg and Clarke Rountree, Fresno, Cal., for Duncan Ceramics, Inc.

COYLE, District Judge.

This case was tried before the court without a jury; Robert S. Griswold, Jr., Special

Assistant United States Attorney and Stephen L. Day, Senior Trial Atty., appeared for the United States of America; Robert G. Carter and Clarke Rountree appeared for Duncan Ceramics, Inc. (hereafter referred to as Duncan); and Dean A. Bailey, Theodore W. Russell and Ronald Sandhaus appeared for Yellow Freight System, Inc. (hereafter referred to as Yellow Freight).

The respective defendants have been charged by Informations with fifty counts of knowingly granting, on Yellow Freight's part, and knowingly receiving, on Duncan's part, a concession from the freight rates published in the tariffs applicable to the transportation of certain freight during portions of January, February, March and April, 1975, all in violation of the Interstate Commerce Act, 49 United States Code Section 41(1) (commonly referred to as the Elkins Act).[1] Plaintiff contends that defendants were charging a certain volume rate applicable to pool distribution shipments when, in actuality, the shipments at issue were neither pool distribution volume shipments nor entitled to the volume rate.

The case was taken under submission at the conclusion of the evidence and argument in order to permit the court to rule with regard to questions of law either conditionally ruled upon by the court during the trial or raised by the parties during closing arguments.

The court, having heard all the testimony and arguments and having viewed all the physical evidence, enters the following rulings and thereafter makes the findings of fact[2] and conclusions of law set forth herein.

### RULINGS

#### I. *Applicability of the Elkins Act.*

Defendants have moved that this court reconsider its disagreement with the assertion made by defendants in two previous motions to dismiss information that prosecution pursuant to the Elkins Act is improper and that defendants should be prosecuted pursuant to 49 U.S.C. § 322(c) of the Motor Carriers Act.[3] Defendants contended that legislative history and Interstate Commerce Commission (hereafter referred to as ICC) interpretation establish that the Elkins Act does not apply to motor carriers or that the intent of Congress to apply the Elkins Act to motor carriers is ambiguous, therefore requiring the imposition of the more lenient statute.

■ The court declines to reconsider the same arguments which twice have been presented to it. Defendants' remedy is to appeal the court's orders denying the motions to dismiss to the Ninth Circuit. In any event, resolution of this issue presents a matter of sentencing rather than a matter of dismissal of the prosecution since the Informations clearly allege the requisite elements under either 49 U.S.C. § 41(1) or 49 U.S.C. § 322(c). *See United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *United States v. Burnett,* 505 F.2d 815 (9th Cir. 1974); *Kniess v. United States,* 413 F.2d 752 (9th Cir. 1969).

#### II. *Primary Jurisdiction.*

In the briefs and during closing argument to the court, counsel for Yellow Freight made reference to the primary jurisdiction doctrine and asserted that the imposition of this doctrine precludes the court from construction or interpretation of certain terms in the relevant tariffs. Defendants further contend that it is the obligation of the ICC to seek the determination.

Plaintiff argues that stay and remand to the ICC is inappropriate for these reasons: (1) a defense based on primary jurisdiction

1. All references hereafter to the United States Code shall be as "U.S.C.".

2. The court was not requested to make specific findings of fact pursuant to Rule 23(c), Federal Rules of Criminal Procedure. However, the court feels that the complexity of the evidence presented in this case requires more than general findings of guilt or innocence.

3. In 1977, Congress reworded and renumbered most of the provisions of the Interstate Commerce Act. Since the events here involved occurred prior to 1977, all references to the provisions of the Interstate Commerce Act are to the provisions as they read prior to that date and as then published and numbered in Title 49, United States Code.

has been waived by defendants' failure to assert it in a more timely fashion, (2) the position of the ICC is known because it is a party to this action, and (3) the terms complained of by defendants are not peculiar or technical terms requiring resort to the expertise of the ICC for construction.

▪ Defendants are contending that certain terms in the relevant tariffs have a peculiar meaning. However, they have neither presented evidence to support this position nor have they clearly and concisely articulated to the court their position with regard to construction. Vague and unreferenced statements in the briefs and closing argument simply are not sufficient to present the issue of primary jurisdiction to the court for ruling. In any event, the court does not find that any of the language of the tariffs on their faces so specialized as to mandate a remission to the Interstate Commerce Act in the absence of evidence to that effect. Furthermore, the more than four years delay in raising this contention, in conjunction with the opaque presentation of the issue, inclines the court to doubt the validity of the argument. In this regard, we do not agree with defendants' assertion that the onus of seeking ICC interpretation is on plaintiff. Plaintiff obviously feels its position is correct and it is defendants who are asserting primary jurisdiction as a prerequisite to this prosecution. Consequently, it is for defendants to persuade the court of the efficacy of their contention. Because of the failure to do so, the court declines to stay and remand these proceedings for a purpose which has not been explained and justified.

### III. *Evidence of Knowledge and Good Faith.*

▪ Plaintiff moved at the outset of trial that evidence of defendants' good faith or knowledge with regard to the alleged violations of the Elkins Act is inadmissible. The court ruled this evidence admissible subject to plaintiff's continuing objection.

Plaintiff's primary contention is that the Elkins Act constitutes a *malum prohibitum* crime thereby obviating the need for plaintiff to establish proof of intent to violate the Elkins Act as charged in the Informa-

tions. However, plaintiff cites no cases holding that violations of the Elkins Act are indeed *malum prohibitum*. In fact, the legislative history of the Elkins Act indicates the contrary.

The critical issue is the effect of the insertion of the word "knowingly" into 49 U.S.C. § 41(1) by congressional amendment in 1906. Prior to this amendment, Section 41(1) merely made it unlawful for any person to grant or receive a concession from the rates named in the tariffs published and filed by the carrier. The addition of "knowingly" to the statute was made because the Senate was unwilling to punish with criminal sanctions honestly mistaken departures from published rates or honest mistakes as to the appropriate rate. 40 Cong.Rec. 7932–36, 7985, 7987, 7990–92, 7995 (1906).

The court is aware that in *Union Petroleum Corporation v. United States*, 376 F.2d 569, 573–574 (10th Cir. 1967), the Tenth Circuit upheld the rejection of appellant's defense in a prosecution pursuant to 49 U.S.C. § 41(1) that it did not knowingly solicit or accept a concession, but acted in the honest and reasonable belief that it was entitled to avail itself of a transit tariff provision:

> In this case the statutes provide it shall be penal to receive transportation of goods at less than the published rate. Whether shippers who pay a rate under honest belief that it is the lawfully established rate, when in fact it is not, are liable under the statute because of a duty resting on them to inform themselves as to the existence of the elements essential to establish a rate as required by law, is a question not decided because not arising on this record. The stipulated facts show that the shippers had knowledge of the rates published and shipped the goods under a contention of their legal right to do so. This was all the knowledge or guilty intent that the act required. Union stresses that the Armour case was decided prior to the insertion of the word "knowingly" into the Elkins Act by amendment of 1960... We do not think

that this amendment alters the fundamental principal that one's mistaken understanding of the law does not constitute a defense... Furthermore, the term "knowingly" imports merely perception of the facts necessary to bring the questioned activity within the prohibition of the statute. The term does not require as a part of its meaning that there necessarily be knowledge or awareness that such activity is in fact prohibited... Union had full knowledge of the tariffs as well as all facts which would render the transit privilege inapplicable and discriminatory herein, but it nevertheless operated upon the supposition of its legal right to do so. 'The courts have found the statutes effective to accomplish the destruction of discriminatory practices, whatever their form. Violation of the commerce acts through receipt of advantages is to be tested by actual results, not by intention. Any and all means to accomplish the prohibited end are banned.' [citations omitted]

However, *United States v. United States Steel Corp.*, 645 F.2d 1285, 1295–1297 (8th Cir. 1981), involving 49 U.S.C. § 41(3), stated in *dicta* its disagreement with the holding in *Union Petroleum Corporation*. The Eighth Circuit felt that the legislative history underlying the 1906 addition of "knowingly" to the statute is indicative that the *Union Petroleum Corporation* decision is erroneous. The Eighth Circuit also found support of its position in an analysis of the decisions of the United States Supreme Court in *Armour Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908) and *Lehigh Coal & Navigation Co. v. United States*, 250 U.S. 556, 40 S.Ct. 24, 63 L.Ed. 1138 (1919). The Eighth Circuit states at pages 1296–1297:

> The clear implication, [from *Lehigh Coal & Navigation Co.*] is that a shipper has a defense against a prosecution under the Hepburn Act if it establishes its honest and reasonable belief that it was entitled under the terms of the applicable tariff to any rebate or offset it may have received.
>
> *Armour Packing Co. v. United States* ...
> and *Petroleum Corp. v. United States* ...

are not to the contrary. *Armour Packing* was decided before *Lehigh Coal* and under the version of the Elkins Act in effect before the insertion of the word "knowingly" by the 1906 amendments. In any case, in *Armour Packing* the shipper clearly knew what tariff applied and what rates that tariff fixed; its defense to the Elkins Act prosecution was that it believed in good faith that its contract with the carrier, rather than the published tariff, controlled the rates it must pay. The Supreme Court simply held that the shipper would be held to know that as a matter of law the tariff rates prevailed over the contract rates; the Court specifically reserved the question later addressed in *Lehigh Coal* and raised here, 'Whether shippers who pay a rate under the honest belief that it is the lawfully established rate, when in fact it is not, are liable under the statute ...' ...
*Union Petroleum* too is distinguishable from this case. There the shipper paid the carrier a transit or through rate lower than the local rates even though it was substituting one product for another at an intermediate point of the journey. Its defense to the Elkins Act prosecution was that it 'acted in the honest and reasonable belief that it was entitled to avail itself of the transit tariff provision.' ...
The Tenth Circuit rejected this defense, finding that the shipper 'had full knowledge of the tariffs as well as all facts which would render the transit privilege inapplicable and discriminatory herein...' We think that this finding was probably sufficient to negate the shipper's good faith defense *on the merits*, on the ground that the shipper could not have believed 'honestly and reasonably' that it was entitled to the transit rate in view of its full knowledge of the relevant tariffs and the facts rendering the transit rates inapplicable. We recognize that there is language in *Union Petroleum* that suggests that the court rejected the shipper's good faith defense *in principle*. To the extent that that language is inconsistent with the legislative history of the Hepburn Act and the holding of the Su-

preme Court in *Lehigh Coal*, we simply disagree with it.

We conclude that a shipper has a defense to a treble forfeiture proceeding under the Hepburn Act if it can establish that any rebates or offsets it may have received (even though these are later determined to be unauthorized by the applicable tariff) were received in the honest and reasonable belief that they were in fact authorized by the tariff, and that in receiving them the shipper was not disregarding what it believed to be the provisions of the tariff but was complying therewith... As to the defense here recognized, we believe that where a shipper can establish its honest and reasonable (though mistaken) belief by reference to ambiguities in the tariff itself, the history of its adoption and of practice under it or the opinions of those in authority about the rates fixed thereby, the shipper has a good defense. [footnotes and citations omitted]

■ The rationale and conclusion of the Eighth Circuit is the more compelling and this court will follow it in this decision.[4] This holding does not mean that the carrier and shipper may assert a defense to prosecution under the Elkins Act by merely hiding their heads in the sand with regard to the applicable tariff provisions. The court reiterates that in order for good faith or lack of knowledge to be viable defenses to Elkins Act prosecutions, each defendant must introduce slight evidence sufficient to create the issue that its belief that the applicable tariffs in fact authorized the rates charged was honest and reasonable and that in according and receiving these rates each defendant honestly and reasonably believed that it was complying with the applicable tariff provisions. If the defendant makes such a showing, the burden remains on plaintiff to establish beyond a reasonable doubt that the justification offered is insufficient. Wright and Miller, 2

Federal Practice and Procedure, § 403, p. 67.

IV. *Substantial Compliance.*

■ Duncan argues that substantial compliance with the requirements of the applicable tariffs will suffice to negate any alleged violations of the Elkins Act. In support of this contention, Duncan cites *Inland Cities Express v. Diamond Nat. Corp.*, 524 F.2d 753 (9th Cir. 1975), a case founded upon diversity jurisdiction and involving a suit by the carrier against the shipper for undercharges purportedly resulting from the failure of the shipper to comply with the documentation requirements of applicable intrastate tariffs for split-delivery and multiple-lot shipments. The Ninth Circuit held at page 756:

> The purpose of the single multiple-lot document in Item 85(a)(3) is to assist the carrier in proving and the PUC in verifying ... that the multiple lots are initially intended to be a single shipment....
>
> .    .    .    .    .
>
> Where the purposes to be served by the documentation requirements are met, the technicalities of documentation cannot defeat a claim to tariff exception.

Not surprisingly, plaintiff strenuously contends that the doctrine of substantial compliance is irrelevant as a defense to alleged violations of the Elkins Act and points out that the only decision permitting the defense involved intrastate as opposed to interstate tariffs.

This court is reluctant to deviate from the expressed intent of the Elkins Act and the general intent of the Interstate Commerce Act to control tightly and regulate interstate commerce. However, the court also feels that the above-quoted statement of the Ninth Circuit has relevance in determining whether the shipper or carrier honestly and reasonably believed that they

---

4. This court is aware that the decision in *United States v. Atchison, Topeka & Santa Fe Railway Company*, Criminal No. 79–437–RJK (C.D. Cal., entered March 20, 1980), aff'd 633 F.2d 224 (9th Cir. 1980), *cert. denied* 452 U.S. 939, 101 S.Ct. 3081, 69 L.Ed.2d 953, is contrary to this holding. However, the decision is not precedential in this circuit and we decline to follow its analysis. Rule 21(c), Rules of the United States Court of Appeals for the Ninth Circuit.

were complying with the requirements of the applicable tariffs. Thus, if the purposes for which the tariffs were adopted are satisfied even though the actual practice of the parties reveals *minor* deviations from the exact requirements of the tariffs and the parties honestly and reasonably believe that their practices were in compliance, these facts, if established, are factors bearing upon the effect of a "knowingly" granted or received concession for purposes of Section 41(1).

## V. *Expert Testimony.*

■ Defendants contended during closing arguments that the term "not more than two vehicles" in Tariff ICC RMB 226–A (see *infra* for pertinent text of tariff) is a term of art requiring the testimony of an expert witness for proper construction. Inferentially, defendants are arguing that the absence of such expert testimony precludes any construction by the court as to the meaning of this term.

Quite frankly, the court feels ill-used by this contention. The record shows repeated objections by all parties to the introduction of expert testimony. The court finally ruled that expert testimony was inadmissible based on the representations of the parties that this ruling was appropriate and agreeable. The only exception to this ruling was made by counsel for Yellow Freight by which he vaguely and obscurely alluded to certain areas which might require expert testimony if they ever came up. No position, supported by argument or evidence, was ever taken during trial that the term "not more than two vehicles" was such an area. The court recognizes that burden of proof with regard to the elements of the Elkins Act violations alleged here is on the plaintiff. However, there is nothing in plaintiff's case to indicate that "not more than two vehicles" does not mean just that. It is then incumbent upon defendants to

inform the court concisely and in a timely manner that this was not the case and call an expert witness. The court declines at this late stage to rely upon an unsupported contention of defendants.

In any event, such a ruling is unnecessary as no evidence was submitted upon which the court could make a finding concerning the actual number of vehicles into which Duncan goods were loaded by Yellow Freight during the times at issue in this Case. This evidentiary failure resulted because the local dispatch records maintained by Yellow Freight for the times at issue were destroyed some time prior to the entry of the discovery order in this case.[5]

## VI. *Legal Rate.*

■ Defendants argue that even if the evidence shows Yellow Freight did not comply with the requirements of the applicable tariffs, the rate charged to Duncan remained the proper rate and, thus, no concession was granted to the shipper. Defendants rely on *Johnson Machine Works, Inc. v. Chicago, B. & Q. R. Co.,* 297 F.2d 793 (8th Cir. 1962). However, the court is faced with deciding not whether undercharges could or could not be collected by Yellow Freight but whether Yellow Freight's actions in indicating to Duncan that Yellow Freight could provide pool distribution service and rates to Duncan constitutes a concession within the meaning of 49 U.S.C. § 41(1). If the evidence shows that Duncan was justified in relying upon Yellow Freight's representations that it could legally and physically provide this service, that still does not absolve Yellow Freight of criminal liability for charging rates based on services it could not legally provide.

## VII. *Bootstrap Contention.*

■ During closing argument, counsel for Duncan argued that plaintiff's position

---

5. Edwin Bill, transportation, rate and tariff agent for the Interstate Commerce Commission in 1975, testified that he examined Yellow Freight's records during May through August, 1975 but could not locate the pertinent local dispatch records. Yellow Freight intimated at trial that these records had been destroyed in the ordinary course of business and that Bill

had been told this. Plaintiff has made no charges to the court that Yellow Freight caused these records to be destroyed in anticipation of prosecution resulting from Bill's investigation. Therefore, the court deems it established that the local dispatch records were destroyed in the ordinary course of business.

in this case amounts to bootstrapping one violation of Section 41(1) into another violation of Section 41(1). In essence, defendant's argument can be stated thusly: Section 41(1) provides in part that the "... wilful failure upon the part of any carrier ... to strictly observe such tariffs until changed according to law, shall be a misdemeanor [punishable by] a fine of not less than $1,000 nor more than $20,000 for each offense; ..." Section 41(1) also makes it unlawful "... for any corporation to offer, grant or give, or to solicit, accept, or receive ... any concession ... in respect to the transportation of any property in interstate commerce ... whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs...." Because the primary thrust of plaintiff's case is that requirements of the applicable tariffs were not followed (which is the first part of Section 41(1)), thereby resulting in a "concession," (which is the second part of Section 41(1)), plaintiff is bootstrapping defendants into a violation of the Elkins Act.

While at first blush defendants' argument has appeal, closer scrutiny reveals its fallaciousness. It is plaintiff's position that both the carrier and the shipper knowingly violated the tariffs, thus resulting in a concession from the rate which otherwise would have been applicable. Clearly, plaintiff could not prosecute both parties under that part of Section 41(1) making illegal the wilful failure by a carrier to observe the tariffs.

### VIII. *Number of Counts.*

■ At closing argument, defendants contended that the number of counts charged against each should be four instead of fifty. Their theory is that only four shipments occurred during the times at issue as evidenced by the so-called master bills of lading. Plaintiff counters that each of the bills of lading underlying the master bill of lading constitutes a single shipment.

Defendants cite *Standard Oil Co. of Indiana v. United States*, 164 F. 376 (7th Cir. 1908), rev'g *United States v. Standard Oil Co. of Indiana*, 155 F. 305 (N.D.Ill.1907) and *United States v. Standard Oil Co.*, 170 F.

998 (N.D.Ill.1909). Standard Oil Co. of Indiana was prosecuted for 1,462 counts of violations of the Elkins Act. The gist of the complaint was that Standard transported oil in oil tank cars over certain routes but paid less than the rate per 100 pounds of oil. The defendant was found guilty on all counts. Each count represented an oil tank car. The United States argued that the number of offenses was the number of car loads of property transported, irrespective of whether each car load constituted the whole, or a part only, of an actual shipment. Thus, each car transported was a separate act of transportation, evidenced by the issuance of a way bill for every car. Standard argued in part that the Elkins Act authorizes prosecution only for each bill rendered by the carrier at the lower rate and paid by it. The district court agreed with the United States and stated "... the offense is complete whenever any property is transported at less than the lawful rate, [thus] the law is violated every time any property is so transported." 155 F. at p. 313. The Seventh Circuit reversed and remanded. It held that "[t]he offense of accepting a concession is the 'transaction' that the given rebate consummates—not the units of mere measurement of the physical thing transported—but the 'transaction' whereby the shipper, for the thing shipped, no matter how great or how little its quantity, received a rate different from the established rate...." 164 F. at p. 386. The district court on remand held that there can be no greater number of offenses than there were payments of freight. 170 F. at pp. 995–999.

The court questions whether these decisions are controlling. The plaintiff's case here is that the parties gave and received pool distribution volume rates for less than truckload (LTL) shipments. In the *Standard Oil of Indiana* case, the plaintiff's initial theory was not predicated on shipments at all. At the same time, however, there is no doubt in this matter that there were only four "transactions" resulting in payment by Duncan to Yellow Freight. The single shipments alleged to have occurred were not paid for by Duncan as such. If

the court accepted defendants' theory, they would be penalized for only four defective pool distribution volume shipments rather than for fifty LTL shipments with respect to each of which a much lower rate was "paid" on a pro rata basis. Because the evidence establishes that the transactions here were LTL shipments disguised as pool distribution volume shipments, the court rules that the appropriate number of counts is as was charged in the respective Informations.

## FINDINGS OF FACT

1. At all times material to this prosecution, Duncan, a corporation, was a person within the meaning of 49 U.S.C. § 303(a)(1), and was a shipper tendering traffic within the Eastern District of California for interstate and foreign transportation, subject to the Interstate Commerce Act, 49 U.S.C. §§ 301 *et seq.*

2. At all times material to this prosecution, Yellow Freight, a corporation, was a common carrier by motor vehicle within the Eastern District of California and within the meaning of 49 U.S.C. § 303(a)(14), and was engaged in interstate and foreign transportation subject to the Interstate Commerce Act, 49 U.S.C. §§ 301 *et seq.*

3. At all times material to this prosecution, including the period 1969 through 1974, Yellow Freight was a party with other transcontinental carriers to certain tariffs published by the Rocky Mountain Motor Tariff Bureau, Inc. (hereafter referred to as RMB).

4. During the period January through April, 1975,[6] the RMB tariffs pertinent to Duncan shipments by Yellow Freight were as follows:[7]

A. Eastbound Transcontinental Commodity Tariff, Tariff ICC RMB 226–A, Section 6, (9th revised page 2777) which permits a specific rate on articles listed in Item 8999 transported from Fresno, California (W948) to Chicago, Illinois (5200), subject to certain conditions. The conditions pertinent to this prosecution are that the rate applies only to mixed shipments of 88,000 or more and only when this minimum weight is "loaded in not more than two vehicles." Articles listed in Item 8999 subject to these conditions are pottery molds made of plaster of paris, and paints, stains or varnishes, NOI bronzing liquids, lacquers, shellacs or wood fillers, liquid or paste.[8]

B. Rules and Grouping Tariff—Transcontinental, Tariff ICC RMC 120, Section 1, Item 750 (8th revised pages 68 and 68–A), which provides in pertinent part:

> Except as otherwise provided, rates or charges in tariffs governed by this tariff include one pickup and loading . . . , during business hours . . . , at one site, subject to the following provisions:
>
> (1) Placement of Vehicle for Loading:
>
> At the request of the consignor, the carrier will furnish and place a vehicle at the loading site designated by the con-

---

6. The tariffs are frequently revised. Consequently, the exact provisions of the pertinent RMB tariffs applicable during the period preceding 1975 may not have been identical to those in effect during the early part of 1975. Therefore, the court feels that any reference to carrier and shipper practices (as they relate to pool distribution shipments) are relevant only for the purpose of showing reliance or good faith and not for the purpose of showing that what was done by the parties during the early part of 1975 was in compliance with the pertinent tariff provisions.

7. The tariffs in evidence are contained in plaintiff's exhibits 56a, b and c, and Yellow Freight's exhibits M, N and O. Defendants did not introduce tariffs different from those introduced by plaintiff. Therefore, unless otherwise specified, the court assumes that the tariffs referred to herein are the only ones applicable to the transactions at issue here.

8. Plaintiff in its trial brief contended that one of the commodities shipped by Duncan was falsely described by it on the bills of lading as paint NOI (not otherwise indexed). Plaintiff argued that that commodity actually falls within the classification artists' materials and paints and, thus, the rate set forth in Tariff ICC RMB 226–A, Section 6, Item 8999 (9th revised page 2777) was not applicable. However, plaintiff introduced no evidence with respect to this alleged misclassification. Therefore, the court finds that the classification of commodities on the bills of lading pertinent here was correct in terms of the applicable tariffs.

signor to pick up a shipment there tendered for transportation.

.    .    .    .    .

(3) Loading by Carrier:

Freight tendered for loading shall be so situated by the consignor as to be directly accessible to the vehicle, or it shall be immediately adjacent to a parking space suitable for carrier to place its vehicle for loading (subject to Note 1). Loading includes stowing and counting of the freight in or on the carrier's vehicle . . .

.    .    .    .    .

(6) Loading by Consignor or Unloading by Consignee:

The consignor or consignee may elect to the carrier as provided in this item by performing at his own expense the loading or unloading of the shipment on or from the carrier's vehicle.

.    .    .    .    .

(8) More Than One Loading or Unloading Site:

Upon request of the consignor or consignee, pickup . . . service as defined in this item may be performed at more than one loading site within the continuous plant property or premises of the consignor . . . requesting this service, provided the loading or unloading sites are not separated by more than one public thoroughfare. A vehicle transfer charge of $5.45 will be assessed for each transfer of the vehicle from one loading . . . site to another.

Note 1—(A) Freight shall be deemed to be immediately adjacent to a space suitable for carrier to place his vehicle for loading . . . if separated therefrom only by an intervening public sidewalk.

(B) If a parking space suitable for carrier to place his vehicle for loading . . . is occupied or city ordinance prevents its use, the nearest available parking space may be used.

(C) When two or more shipments are placed by the shipper as close as practicable to a parking space suitable for carrier to place its vehicle for loading, all of such shipments will be considered as immediately adjacent thereto even though the shipment or shipments that were closest

to such parking space were picked up first by the same or different motor carriers.

(D) When shipper assigns to two or more carriers designated space in its shipping room or loading platform where outgoing freight will be placed by the shipper for pickup by the designated carriers and all of such assigned spaces are as close as practicable to a parking space suitable for carrier to place its vehicle for loading, all such assigned and designated spaces will be considered immediately adjacent to such parking space.

C. Terminal Tariff. Tariff ICC RMB 622, Section 1, Item 110 (original page 6), which provides the following definities:

*Component part of the initial shipment*

After the initial shipment has reached the point of distribution and is broken down into component parts for distribution under the provisions of this tariff, each such component part then becomes a 'component part of the initial shipment.' The provisions of Item 610 of this tariff, and section 2 of this tariff, apply on each 'component part of the initial shipment.' The term 'component part of the initial shipment' as used in this tariff means a quantity of freight to be distributed by the carrier at one time from the point of distribution to one ultimate consignee at one point of distribution. Where two or more component parts of the initial shipment are consigned to a carrier, either as a consignee or for the purpose of movement beyond the point of distribution by that carrier, each such component part will be considered as a separate component part of the initial shipment and will be charged for as provided in Section 2, subject to the minimum charge in Item 610.

*Initial shipment*

The term 'initial shipment' as used in this tariff means a quantity of freight tendered by one shipper on one shipping document at one point of origin at one time for one carrier to distribute at a point or points of distribution. An initial shipment must weigh 10,000 pounds or

more, or must have freight charges assessed on a basis of a minimum weight of 10,000 pounds or more.

D. Terminal Tariff. Tariff ICC RMB 662, Section 1, Item 125 (6th revised page 7), which provides in pertinent part:

(1) This tariff contains rules and charges for the distribution of pool shipments at points on the lines of carriers parties to this tariff. The distribution service provided in this tariff includes unloading, segregating, billing, reloading, forwarding or delivery as required.

(2) An initial shipment . . . for distribution must be consigned to or in care of carriers parties to this tariff at points on their lines. The provisions of this tariff apply only when an initial shipment is transported, freight charges prepaid, into the distribution point of the carrier's terminal serving such point on the line of the carrier who is to perform the distribution service and must be consigned to, or in care of, that carrier.

(3) Distribution of 'initial shipments' will be made at the distribution points described in Section 2 of this tariff, in accordance with individual bills of lading, or distribution sheet furnished by the shipper, for which service charges provided in Section 2 of this tariff will be assessed. When a component part of the initial shipment is reshipped beyond the distribution point, a separate bill of lading to cover the beyond transportation must be furnished by the shipper. These component parts will be subject only to a handling charge of 42 cents per 100 pounds subject to a minimum charge of $4.25 and a maximum charge of $40.78. Distribution charges named herein must be prepaid by the shipper.

(4) The distribution service provided in this tariff applies only on freight moving under rates published in Item 100 in this tariff, to the points listed in Section 2 in this tariff via one of the carriers shown opposite such point. [Included in Item 100 are Tariff ICC RMB 120 and Tariff ICC RMB 226–A.]

(5) The provisions of this tariff apply only when an initial shipment is comprised of two or more component parts (see Item 110).

(6) The provisions of this tariff will apply only when the component parts of the initial shipment are in the same shipping form as the initial shipment.

E. Terminal Tariff. Tariff ICC RMB 662, Section 2 is entitled "Alphabetical List of Points at Which Distribution Service is Showing Applicable Distribution Charge . . . and Carriers Providing Distribution Service at Each Point (Subject to Section 1)."

F. National Motor Freight Classification 100A (effective March 29, 1974), Item 110, Section 5, which states, "[u]nless otherwise provided in carriers' tariffs, a shipment consists of a lot of freight tendered to a carrier by one consignor at one place at one time for delivery to one consignee at one place on one bill of lading."

5. The tariffs result from rate proposals filed by member carriers of RMB. These proposals are taken before the Transcontinental Rate Committee for presentation, discussion and vote. Once adopted, the tariffs are published. If a member carrier does not want to participate in a particular tariff or tariff provision, the published tariff will so indicate. Otherwise, the tariff applies to all members of RMB. Of the tariff provisions pertinent to this prosecution, Yellow Freight has not by affirmative designation indicated that it is not a participant.

6. At all times material to this prosecution, Duncan was located in Fresno, California and engaged in the ceramics business. Its business included the manufacture of paints, glazes, kilns and molds for use by the ceramics industry and by individual craftsmen.

7. At all times material to this prosecution, Duncan's offices, manufacturing facilities and warehouses were located on a tract

of land on East Shields Avenue. The paint warehouse was adjacent to the loading docks and the remainder of Duncan's materials were located in a warehouse on the premises but across from the loading docks.

8. Prior to and during the early part of 1975, the volume of Duncan's business expanded rapidly. Duncan obtained numerous customers in the eastern part of the United States as well as more regional customers.

9. Prior to the latter part of 1969, Duncan had been shipping its freight to all of its customers on a less than truckload basis (hereafter referred to as LTL). An LTL basis or an LTL shipment refers to commodity rates subject to a minimum weight (apparently of less than 10,000 pounds). LTL charges were assessed at the applicable minimum weight (except that the actual weight was used if it was in excess of the specific minimum weight.)[9]

In late 1969, Duncan hired a traffic manager, Bruce Harris, who retained this position through January, 1974. Harris believed that Duncan's volume of shipments to the eastern United States justified the institution of pool distribution volume shipments, the freight charge rating on which would result in an approximately 22% savings in freight charges over LTL rates.

10. Based on Harris' recommendations, Duncan commenced pool distribution volume shipments. When these shipments first commenced, Duncan often would have to accumulate freight over a period of time in order to meet the then applicable weight requirements for these types of shipments. However, toward the end of Harris' employment with Duncan, Duncan was obtaining sufficient orders from east coast customers to utilize a pool distribution volume shipment on a weekly basis.

11. At all times material to this prosecution, a pool distribution volume shipment refers to an initial shipment weighing 10,000 pounds or more which was tendered and loaded at one time and at one place and on one shipping document for transportation by the carrier into the distribution point of the carrier's terminal serving that distribution point listed in Section 2 of Tariff ICC RMB 662. At the distribution point, the initial shipment was broken down into the individual shipments, referred to as component parts of the initial shipment, which were either consigned to a carrier for delivery to the customer or were consigned to a carrier for further transportation to another distribution point or to destination. If further transport from the initial distribution point was required, the shipper was required to provide a separate bill of lading for that portion of the transportation.

12. At all times material to this prosecution, the volume rate applicable to the pool distribution shipments at issue between Fresno, California and Chicago, Illinois was the volume rate set forth in Tariff ICC RMB 226–A. The freight charge rate for transportation beyond Chicago was determined from other tariff rates covering the transportation from Chicago to ultimate destination.

13. At all times material to this prosecution, including, unless otherwise indicated, the period late 1969 through 1974, Duncan's procedures for preparing freight for shipment by Yellow Freight and other carriers generally were as set forth herein.

Orders for Duncan's goods were received mainly by telephone and sometimes in writing. These orders were destined for east coast and west coast customers as well as for customers located at various intermediate points.

Duncan personnel proceeded to verify and process the orders, which process required approximately one day. Once com-

---

**9.** *See* Tariff ICC RMB 120, Item 110 (5th revised page 8). Throughout the trial, the parties referred to LTL shipments but never explained what the concept meant to them in exact terms. While the tariff provision cited by the court herein was applicable during the early part of 1975, the court does not know whether the same or similar provision was in effect during 1969 through 1974. However, it is clear to the court that the definition of an LTL shipment must have been somewhat similar to that in effect in 1975 because the references were tailored toward weight requirements. In any event, the specific tariff provision was applicable during the period covered by this prosecution.

pleted, a packing slip was prepared and a credit check run on the purchaser, a process which took approximately one day.

The traffic manager during the early part of 1975, Robert Cavalla, would determine whether a particular order destined for the east coast was to be shipped as a pool distribution shipment or as an LTL shipment. Cavalla was able to make this determination because he had a copy of Tariff ICC RMB 226–A (9th revised page 2777) and also because almost all Duncan shipments with Yellow Freight, Inter Mountain Lines and I. C. X. were treated as pool distribution shipments. Cavalla would have the packing slip marked "LTL" if the particular order was not to be part of a pool distribution or "master bill" shipment.[10]

The packing slip then was sent to the shipping department located in the paint warehouse. The shipping department kept the packing slips for paints and glazes but sent the packing slips for molds to the other warehouse. The packing slips were put in baskets at the warehouses marked LTL or master bill. Personnel in the warehouses then began pulling the items from stock and placing them on pallets. The pullers also prepared the bill of lading for each order. On occasion, items ordered by a customer were not in stock and, thus, were not available for palletizing at the time the packing slip was received. These packing slips were set aside until such time as the order could be filled.

When a pallet in either the shipping department or the mold warehouse was loaded by the pullers, the pallet, with the bills of lading, now marked LTL if that were the case, for each order, was transferred to the staging area at the loading docks or to an area adjacent to the staging area. During the early part of 1975, Duncan had four loading docks. This number of loading docks was not always sufficient to permit the staging of all freight for loading by the carriers that was to be shipped by Duncan on a daily basis.

Duncan made no effort to segregate its shipments at the staging area by general destination or by the type of shipment (i.e. LTL or pool distribution) and have these shipments loaded at one time by the particular carrier involved.

14. Master bill shipments (pool distribution shipments) generally were loaded by Yellow Freight on Thursdays and Fridays of each week.[11] Any LTL shipments to be transported by Yellow Freight also were loaded on these days.

15. The ordering, palletizing and staging process operated continuously throughout any given week.

16. Generally, Duncan would contact Yellow Freight on Wednesday to notify it of shipments to be loaded on Thursday and Friday. Usually, Duncan would know by Wednesday if it had sufficient tonnage to be loaded to satisfy the minimum weight condition of Tariff ICC RMB 226–A (9th revised page 2777). If Duncan had the tonnage, the traffic manager would instruct Yellow Freight that Duncan had a master bill shipment.

17. Once contacted by Duncan, Yellow Freight would send trucks on Thursday to Duncan's loading docks for loading. If the loading had not been completed by Thursday evening, Yellow Freight sent more

10. The term "master bill" or "master bill shipment" refers to a "master bill of lading." These terms were used by Duncan and Yellow Freight when a purported pool distribution shipment was to be transported by Yellow Freight. Plaintiff referred to the master bills as revenue bills during the trial. The master bill or revenue bill can mean one of two things. It can mean the single sheet billing document sent to Duncan by Yellow Freight, see *infra* (plaintiff's exhibits 51a through 54a and the first sheet of Yellow Freight's exhibits A, C, E and G) or it can mean the compilation of the master or revenue bill, the copies of the freight

bills or the delivery receipts, and the recaps of revenue bill, see *infra* (plaintiff's exhibits 51a, b, and h through 54a, b and h and the first two sheets of Yellow Freight's exhibits A, C, E and G and its exhibits B, D, F and H). All of these documents are virtually identical in content and purpose. For clarity, the court will refer to the term master bill although it is interchangeable with the term revenue bill.

11. East coast shipments also were transported by Inter Mountain Lines although these shipments were staged for loading on Tuesdays and Wednesdays of each week.

trucks on Friday. All Duncan shipments, whether designated LTL or master bill, were loaded over the two-day period. On occasion, the minimum weight of 88,000 pounds necessary for the volume rate to Chicago would not be available for loading at the outset of loading, but the minimum weight would have been loaded when the loading was completed on Friday. This occurred either because the orders had not been palletized and staged until Friday due to the procedures for processing orders for shipment or because there was not enough room in the staging area and the loading docks. At times, Duncan would not be ready for loading when Yellow Freight's trucks arrived at its docks either because other carriers were loading at the loading docks or because the shipments to be transported by Yellow Freight were not ready to be loaded. In these circumstances, the Yellow Freight trucks would park and wait until loading could commence.

18. The minimum weight of 88,000 pounds necessary in order that Duncan obtain the volume rate to Chicago set forth in Tariff ICC RMB 226–A (9th revised page 2777) was loaded in not more than two vehicles as required by this tariff during the period at issue in this prosecution.

19. The term "tendered at one time" as used in Tariff ICC RMB 662, Section 1, Item 110 (original page 6) and National Motor Freight Classification 100A (effective March 29, 1974), Item 110, Section 5 means that the shipper must have the freight to be shipped by the carrier in a position to be picked up and loaded by the carrier when the carrier arrives at the loading docks at the shipper's facility to perform the service of picking up and loading.

If, during the loading dates in the early part of 1975 at issue in this prosecution, Duncan had been adding orders during Thursday and Friday to the shipment to be loaded by Yellow Freight on those days, the court would find that Duncan had not tendered at one time as required by the above-quoted provisions.

However, there is no direct evidence concerning the time of staging of the particular orders comprising the shipments at issue for Yellow Freight pickup and loading. The testimony that on occasion the entire shipment was not staged as of the time Yellow Freight arrived at Duncan's loading docks is not sufficient to establish that the tariff provision was not complied with in regard to these specific shipments or that, as a general rule, the entire shipments were not so staged, thus justifying the inference that this occurred during the early part of 1975.

The fact that the loading of the shipments at issue always took place over a two-day period does not mean that there was not a tender at one time when taken in conjunction with the court's finding that the shipments were staged for loading as of Thursday. The testimony indicates that Duncan's loading facilities were not adequate to handle all of the freight to be loaded by Yellow Freight and other carriers at the same time. And it was the intent and understanding of Duncan and Yellow Freight, established by course of conduct over a many-year period, that the two-day loading of the weekly shipments constituted a legal tender within the meaning of the pertinent tariff provision.

20. Once loaded, the Duncan freight was taken to Yellow Freight's Fresno terminal.

Yellow Freight's transcontinental rate clerk, Burgie Thompson, then processed the Duncan bills of lading.[12]

Thompson first coded by a single letter code each bill of lading, whether LTL or pool distribution shipment, by reference to a code book, broken down by states, for the Yellow Freight break bulk terminal which would handle the ultimate delivery of the shipment relating to the bill of lading. Thompson would choose the break bulk terminal which afforded the most direct route to destination according to Yellow Freight's load pattern. At times, two break bulk terminal codes were placed on the Duncan

---

12. The Yellow Freight procedures set forth herein generally were followed by Thompson for all freight to be shipped from Fresno al-

though the specifics would differ depending upon the type of shipment.

bills of lading. This was done if Thompson was not certain that delivery could be made to the break bulk terminal closest to destination. The second single letter code indicated the next closest break bulk terminal to destination.

After coding the Duncan bills of lading, Thompson made copies of the bills of lading so that Yellow Freight's dock crew could unload the freight, count and check it and separate it on the docks according to the break bulk terminal codes.

The bills of lading then would be returned to Thompson who separated them into stacks by reference to the break bulk terminal codes. Thompson then would assign the freight to trucks in conjunction with instructions from Yellow Freight's Central Dispatch Office, see *infra*, and with state laws governing truck weights and types.

The next step in the process was the rating of the bills of lading.

For the master bill dated January 24, 1975, the Duncan bills of lading representing counts 1 through 3, 6 through 10, and 12 were rated "X-Chi" by Thompson. For the master bill dated February 28, 1975, the Duncan bills of lading representing counts 13 and 14 and counts 16 through 23 were rated "X-Chi". For the master bill dated March 21, 1975, the Duncan bills of lading representing counts 24 and 25, counts 27 and 28, and counts 30 through 36 were rated "X-Chi". For the master bill dated April 25, 1975, the Duncan bills of lading representing counts 37 through 50 were rated "X-Chi".

The designation "X-Chi" signified that the respective Duncan bills of lading had freight charges assessed from Chicago on to the ultimate destination of the shipment. This rating meant that the rate for shipment from Fresno to Chicago permitted by Tariff ICC RMB 226-A (9th revised page 2777), Item 8999 was applied to each individual shipment as if each individual shipment went into Chicago and then a different rate was applied for the shipment from Chicago to the ultimate destination.

None of these shipments were transported by Yellow Freight to Chicago or to a Yellow Freight satellite terminal serving the Chicago metropolitan area.

Yellow Freight had two terminals serving the Chicago metropolitan area, one in Chicago and one in Geneva, Illinois. However, neither of these terminals had the facilities necessary to handle the distribution of pool distribution shipments. Yellow Freight had a terminal in Effingham, Illinois (approximately 212 miles from Chicago) which had facilities for the distribution of pool distribution shipments. The Chicago terminals were considered by Yellow Freight to be satellite terminals of the Effingham terminal. There were several instances where the individual shipments were transported into Effingham. This was mainly for break bulk distribution, although on two occasions Effingham was the distribution terminal for freight to the Geneva, Illinois terminal. However, Effingham, Illinois was not a distribution point listed in Tariff ICC RMB 662, Section 2.

The "X-Chi" ratings were made to give Duncan the benefit of the cheaper rate into Chicago as shown on Tariff ICC RMB 226-A (9th revised page 2777).

For the master bill dated January 24, 1975, the Duncan bills of lading representing counts 4 and 5, and count 11 were rated "X-STL". For the master bill dated February 23, 1975, the Duncan bill of lading representing count 15 was rated "X-STL". For the master bill dated March 21, 1975, the Duncan bills of lading representing counts 26 and 29 were rated "X-STL".

The designation "X-STL" meant that the respective Duncan bills of lading representing counts 4, 5 and 15 had freight charges assessed from St. Louis on to the ultimate destination of the shipments. The record does not indicate whether or not St. Louis was a distribution point for purposes of Tariff ICC RMB 662, Section 1, Item 125 (6th revised page 7) and Section 2. However, Thompson's testimony indicates that the St. Louis ratings were made under an entirely different tariff, the Midwest Tariff No. 1, which is not in evidence.

The designation "X-STL" coupled with the designation "S" with regard to the re-

spective Duncan bills of lading representing counts 11 and 26 meant that the freight charges were assessed from Fresno to Chicago in accordance with Tariff ICC RMB 226–A, Section 6, Item 8999 (9th revised page 2777), but, because the shipment was destined for St. Louis, these shipments were considered by Thompson to be stop off points on a pool distribution shipment to Chicago and, thus, St. Louis stop off charges were assessed. However, neither Tariff ICC RMB 226–A nor Tariff ICC RMB 662 refer specifically to stop off charges. Tariff ICC RMB 662, Section 1, Item 595 (13th revised page 8) provides that "[t]he maximum charge for the distribution of each component part of the initial shipment ... will be $40.78." This amount equals the stop off charge assessed by Thompson with respect to the above-referred to bills of lading.

The designation "X–STL" coupled with the designation "N" (for Nashville, Tennessee) with regard to the Duncan bill of lading representing count 29 was not explained by Thompson.

The Duncan bill of lading representing count 35 was rated "X–Chi" coupled with the designation "S". Thompson testified that this meant that the freight was shipped to the St. Louis break bulk terminal but was rated as if the shipment went from Fresno to Chicago because it actually was destined for Beloit, Wisconsin, a point between St. Louis and Chicago. However, Beloit, Wisconsin is north of Chicago and no provision in the applicable tariffs permits this.

Thompson also indicated on each Duncan bill of lading what the LTL rates would have been if the order represented by that bill of lading had been rated as an LTL shipment.

21. Subsequent to the completion of these procedures, Thompson prepared the master bill [13] and the recap of revenue bill.

The master bill usually was prepared by Thompson on the Monday following the Thursday/Friday loading. The initial sheets of the master bills relating to the Duncan shipments at issue here were Yellow Freight bill of lading forms. The initial sheets of the master bills indicated that the shipment was consigned to "DUNCAN CERAMICS PRODUCTS INC., C/O YELLOW FREIGHT SYSTEM DOCK" and that the destination was Chicago, Illinois. The master bills were prepared in order to bill Duncan for the freight charges assessed for the Duncan bills of lading included in the respective master bills.[14]

The St. Louis stop off charges were included in the four master bills at issue here. Each of the four master bills show one St. Louis stop off charge of $40.78. However, Thompson's testimony indicates that there should be one stop off charge for the Janu-

**13.** For the same period of time prior to the period at issue here, the master bill was prepared by Duncan's traffic manager and sent to Yellow Freight with the shipments.

**14.** Plaintiff's exhibits 1a through 50a are Duncan's bills of lading relating to shipments made from January 23, 1975 through April 25, 1975 and which comprise the counts in the respective Informations.

Plaintiff's exhibits 1a through 12a (counts 1 through 12) relate to plaintiff's exhibits 51a and 51d, which are the master bill and the recap of revenue bill dated January 23–24, 1975. Yellow Freight's exhibit A corresponds in part with these plaintiff's exhibits, the discrepancies being Duncan's bills of lading which are included on the recap of revenue bill and whose weight is included in both the master bill and the recap of revenue bill, but which are not included in the counts charged in the respective Informations.

Plaintiff's exhibits 13a through 23a (counts 13 through 23) relate to plaintiff's exhibits 52a and 52d, the master bill and the recap of revenue bill dated February 26–28, 1975. Yellow Freight's exhibit C corresponds in part with these plaintiff's exhibits, the discrepancies resulting as set forth above.

Plaintiff's exhibits 24a through 36a (counts 24 through 36) relate to plaintiff's exhibits 53a and 53d, the master bill and the recap of revenue bill dated March 21, 1975. Yellow Freight's exhibit E corresponds in part with these plaintiff's exhibits, the discrepancies resulting as set forth above.

Plaintiff's exhibits 37a through 50a (counts 37 through 50) relate to plaintiff's exhibits 54a and 54d, the master bill and the recap of revenue bill dated April 23–24, 1975. Yellow Freight's exhibit G corresponds in part with these plaintiff's exhibits, the discrepancies resulting as set forth above.

ary 23–24, 1975 master bill, none for the February 26–28, 1975 master bill, two for the March 21, 1975 master bill, and possibly one for the April 23–24, 1975 master bill. The stop off charges represent the maximum distribution charge allowed by Tariff ICC RMB 662, Section 1, Item 595 (13th revised page 8) for the distribution of the component parts of an initial shipment at the distribution point. These charges were indicated on each of the four master bills in evidence to give the appearance of a valid pool distribution shipment.

A copy of the master bill was sent to Duncan and a copy was retained by Yellow Freight. A copy of the initial sheet of the master bill did not accompany the actual shipments represented by the Duncan bills of lading.

22. A document entitled "recap of revenue bill" also was prepared by Thompson and given to Duncan. This document, part of the total master bill, showed the ultimate destination of each of the individual shipments, their respective weights, the LTL freight charges, the pool distribution shipment freight charges assessed for each individual shipment, and the savings to Duncan in freight charges between the LTL rates and the pool distribution shipment rates.

23. Duncan personnel conferred with Yellow Freight's personnel regarding the implementation of a pool distribution system of transportation. However, Yellow Freight did not inform Duncan that Duncan's freight was not being transported into Chicago nor did Yellow Freight inform Duncan that Yellow Freight did not have a distribution terminal in Chicago or the Chicago metropolitan area. Duncan's personnel assumed that the shipments were going into Chicago.[15]

24. As stated, the loading and dispatching of the Yellow Freight trucks was controlled in part by the Central Dispatch Office located in the Middle West. Personnel

at the Yellow Freight Fresno terminal must consult daily with this office in order to know which trucks to load and dispatch.

All Yellow Freight trucks moving east from Fresno followed the same route.

The first leg of the route was from Fresno to Barstow, California at which there was a Yellow Freight break bulk terminal. Yellow Freight's Barstow terminal was solely a break bulk terminal and had no facilities for the distribution of shipments to customers or to other terminals.

At Barstow, the freight often was reloaded into different trucks for the second leg of the route. However, if a truck leaving Fresno was fully loaded, that truck would not break bulk at Barstow but, rather, would continue until it reached the break bulk terminal, the break bulk/distribution terminal or destination indicated on the particular outbound manifest. This happened with the shipments representing counts 1, 2, 3, 7, 9, 13, 14, 16, 17, 19, 20, 22, 23, 30, 31, 33, 34, 38, 39, 40, 46 and 47. The balance of the shipments representing the remaining counts were broken up at Barstow.

All of the shipments at issue here contained freezable freight. As part of the tariff rate, Yellow Freight gave freezing protection to these shipments generally by consolidating the shipments and by adding heaters to the trucks. These services were performed on all shipments at the Barstow terminal.

The second leg of the Yellow Freight route was through various relay points which always included Albuquerque, New Mexico because the Yellow Freight drivers were domiciled east of Albuquerque, the trucks moved to the various terminals listed on the outbound manifests at which points the freight would either be delivered or transferred to other trucks for transport to

---

**15.** Plaintiff attempted to impeach the testimony of Robert Cavalla, Duncan's traffic manager during the time at issue, by reference to a statement of Cavalla's to ICC investigators on August 12, 1975 that he was aware the shipments did not go through Chicago and that transit time would be increased if they had

gone through Chicago. However, the testimony indicates that the interview of Cavalla was in the form of a discussion and there is no indication from the notes of the interview or the testimony that Cavalla's statement was referenced to the period prior to and during the early part of January, 1975.

another break bulk terminal or to destination.

25. The Duncan shipments represented by all counts in the respective Informations except counts 4, 5 and 15 were misrated by Yellow Freight because none of these shipments were transported as initial shipments into Chicago as required by Tariff ICC RMB 226–A, Section 6, Item 8999 (9th revised page 2777) and by Tariff ICC RMB 662, Section 1, Item 125 (6th revised page 7) and Section 2.

Yellow Freight was aware that the rating of the bills of lading comprising all counts in the respective Informations except counts 4, 5 and 15 was not in compliance with these tariffs.

Yellow Freight gave these ratings to the Duncan bills of lading because it wanted to provide a service to an important customer that it otherwise would not have been able to provide.

Duncan was not involved in the rating of these bills of lading and was not aware that Yellow Freight was not transporting the shipments into Chicago nor was it aware that Yellow Freight could not transport these shipments into Chicago.

26. The Duncan shipments represented by all counts in the respective Informations were not pool distribution shipments for purposes of Tariff ICC RMB 226–A, Section 6, Item 8999 (9th revised page 2777) and by Tariff ICC RMB 662, Section 1, Item 125 (6th revised page 7) and Section 2. None of the shipments were tendered by Duncan to Yellow Freight on one shipping document. None of the shipments transported from Duncan's loading docks were shipped to a distribution point listed in Section 2 and then separated into their component parts for beyond shipment.

█ The master bills prepared by Yellow Freight did not constitute one shipping document. The master bill was prepared for billing purposes only and did not accompany any of the shipments. However, it was understood by Duncan that the shipments at issue were to be transported as pool distribution shipments and that these pool distribution shipments were to be transported to Chicago. This understanding had developed over the several year period that Yellow Freight and Duncan had been doing business. Consequently, it was Duncan's intent and Yellow Freight was aware of this intent that these shipments be transported to Chicago. Therefore, the purpose of the pool distribution tariff was satisfied by Duncan's tender of the freight for pool distribution into Chicago even though no single shipping document was prepared by Duncan.

Yellow Freight was aware that the shipments were not being handled in a manner required by Tariff ICC RMB 662, Section 1, Item 125 (6th revised page 7) and Section 2 because it knew that the shipments were not being transported into a distribution point listed in Section 2 and then being shipped in accordance with the various component parts of the initial shipment. The record as a whole establishes that Yellow Freight did as it pleased with regard to these shipments and for the purpose of providing more rapid and less expensive transportation to a valuable customer than it otherwise could have provided.

27. Duncan was not involved in the routing of these shipments and was not aware that Yellow Freight was not transporting the shipments into an appropriate distribution point.[16]

28. To the extent that any of the foregoing Findings of Fact are deemed to be Conclusions of Law, they will be so considered.

## CONCLUSIONS OF LAW

A. This court has jurisdiction of the offenses charged and venue is properly fixed in the Eastern District of California.

---

**16.** Duncan did not prepare separate bills of lading for shipments beyond the distribution point as required by Tariff ICC RMB 662, Section 1, Item 125 (6th revised page 7). However, plaintiff presented no argument with respect to this requirement nor did it adduce any testimony with regard to this requirement. The court assumes, therefore, that the submission of the bills of lading to Yellow Freight at the outset of the transactions at issue in this case complies with this tariff provision.

B. The defendant Yellow Freight System, Inc. is guilty of the offenses charged in Counts 1 through 50 of the Information.

C. The defendant Yellow Freight System, Inc. did knowingly offer, grant and give concessions to Duncan Ceramics, Inc. in respect to transportation of property in interstate commerce whereby such property was transported at a less rate than that named in the tariffs published and filed with the Interstate Commerce Commission by said defendant.

D. The defendant Duncan Ceramics, Inc. is not guilty of the offenses charged in Counts 1 through 50 of the Information.