UNITED STATES of America,
Plaintiff-Appellee,

v.

YELLOW FREIGHT SYSTEM, INC., a
corporation, Defendant-Appellant.

Nos. 84–1114, 84–1186.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 15, 1985.

Decided April 25, 1985.

Robert S. Griswold, Jr., San Francisco, Cal., for plaintiff-appellee.

Arthur J. Cerra, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant-appellant.

Before BARNES and WALLACE, Circuit Judges, and GRAY,* District Judge.

* Honorable William P. Gray, United States District Judge, Central District of California, sitting by designation.

WALLACE, Circuit Judge:

Yellow Freight System, Inc. (Yellow Freight) appeals its conviction under the Elkins Act, 49 U.S.C. § 41(1) (1976) (recodified as amended at 49 U.S.C. § 11903), on fifty counts of knowingly granting a concession from its published less-than-truckload (LTL) tariffs to Duncan Ceramics, Inc. (Duncan Ceramics). *United States v. Duncan Ceramics*, 544 F.Supp. 1297 (E.D.Cal. 1982) (*Duncan Ceramics*). We have jurisdiction under 28 U.S.C. § 1291. We reverse and remand.

## I

Yellow Freight is a motor carrier authorized by the Interstate Commerce Commission (ICC) to transport property in interstate commerce. *Duncan Ceramics*, 544 F.Supp. at 1305. This case arose under the provisions of the Interstate Commerce Act (Act) before its recodification in 1978 or revision in 1980, and is thus subject to the earlier law. As a motor carrier, Yellow Freight was subject to that portion of the unrevised Act known as the Motor Carriers Act. The unrevised Motor Carriers Act required motor carriers to "establish, observe, and enforce just and reasonable rates." 49 U.S.C. § 316(b) (1976) (recodified as amended at 49 U.S.C. §§ 10701(a), 10702(a)). To assist motor carriers in meeting their duty, the ICC authorized the establishment of rate bureaus, which are organizations of motor carriers that engage in organized rate fixing. *See* Snow, *The Problem of Motor Carrier Regulation and the Ford Administration's Proposal for Reform,* in *Regulation of Entry and Pricing in Truck Transportation* 3, 7 (P. MacAvoy & J. Snow eds. 1977).

Yellow Freight was a member of the Rocky Mountain Motor Tariff Bureau, Inc. (Bureau). *Duncan Ceramics*, 544 F.Supp. at 1305. During the relevant period, the Bureau adopted certain published rates for LTL shipments and lower rates for pooled distribution volume shipments (pooled shipments). *Id.* at 1305, 1308 & n. 9. Member carriers had the nominal right to deviate from established rates, but they could do

so only if they affirmatively designated that they did not wish to adhere to the fixed rates and if they published notification of their nonparticipation along with the tariffs. *Id.* at 1307. Moreover, these carriers had the burden of proving that their substitute rates were reasonable even if they were lower than the organized rates. *See* R. Fellmeth, *The Interstate Commerce Omission* 139 (1970). Yellow Freight did not take such affirmative action, and thus was subject to the Bureau's rates. 544 F.Supp. at 1307.

The Bureau established certain requirements to determine whether a particular shipment qualified for the lower volume rate. *Id.* at 1305, 1308. The requirements were that the shipment have a minimum weight of 10,000 pounds, that it be tendered at one time on a single shipping document, that it be transported to a published distribution break bulk point, and that separate bills of lading be prepared for transportation beyond the break bulk point. *Id.* at 1308. Moreover, the pooled shipment had to weigh at least 88,000 pounds and be loaded onto not more than two vehicles. *Id.* at 1305.

In early 1975, Yellow Freight transported property several times for Duncan Ceramics from Fresno, California to various eastern destinations. *Id.* at 1307–10. Duncan Ceramics qualified for the volume discount each of these times and designated Chicago, a published distribution point, as the break bulk point. *Id.* Yellow Freight charged Duncan Ceramics the volume rate from Fresno to Chicago and LTL rates from Chicago to the various eastern destinations. *Id.* at 1311. The sum of these rates was lower than what straight LTL rates would have been. *Id.* at 1313. But Yellow Freight did not actually route the Duncan Ceramics shipments through Chicago. *Id.* at 1311. Instead, it used either Effingham, Illinois or Barstow, California as the break bulk points, neither of which were published distribution centers. *Id.* at 1311, 1313.

Because Yellow Freight did not actually route the shipments through Chicago, the

district judge concluded that the Duncan Ceramics shipments were subject to the higher LTL rate. *Id.* at 1314. He refused to suspend the case pending a construction of the Bureau's volume tariff requirements by the ICC pursuant to the primary jurisdiction doctrine. Although the district judge discussed the tardiness of raising this issue and Yellow Freight's lack of clarity in its articulation, he essentially held that the evidence supporting the motion to refer was too weak and the tariff's requirements were clear. *Id.* at 1300. Finding that Yellow Freight knew its routing did not meet the volume tariff requirements, *id.* at 1314, the district judge found Yellow Freight guilty of knowingly granting Duncan Ceramics a concession from the applicable LTL rates under either the Elkins Act or the Motor Carriers Act. *Id.* at 1315. The district judge reasoned that both acts applied to motor carriers, *id.* at 1299, and fined Yellow Freight under the more severe Elkins Act. He assessed Yellow Freight $10,000 for each count in the indictment for a total of $500,000, but suspended all but $50,000 and placed Yellow Freight on probation on condition that it obey all laws, contribute 100 hours of a corporate officer's time to the National Center for Community Correction, contribute $50,000 to that organization, and make semi-annual reports concerning its contribution of time.

## II

Yellow Freight argues that it did not violate the concession provisions of either the Elkins Act or the Motor Carriers Act because industry usage allows carriers to break bulk at the most economical point so long as they give the shipper the lowest possible rate based on potential routing through any published break bulk point. The essence of its argument is that the details of tariffs are published solely for the benefit of shippers to establish standards under which they can demand the lowest possible rate and that industry custom does not construe them rigidly against carriers. Yellow Freight contends that the ICC would have recognized this industry practice as a matter of sound transporta-

tion policy, and thus the district court erred in formalistically dismissing the argument instead of transferring the case to the ICC for its construction of the tariff's terms pursuant to the primary jurisdiction doctrine. Because we agree with Yellow Freight that this case should have been transferred to the ICC, we do not reach Yellow Freight's other arguments that it did not have the requisite scienter to violate the concession provisions of either statute or that the Elkins Act does not apply to motor carriers.

■ "The doctrine of primary jurisdiction ... is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific Railroad,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (*Western Pacific*). The doctrine is applicable in federal courts when an action "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 64, 77 S.Ct. at 165. Application of the doctrine results in suspension of the judicial process "pending referral of such issues to the administrative body for its views." *Id.* See also *General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940) (proper procedure is to stay the proceedings).

■ Whether the doctrine requires the ICC to pass on the construction of a particular tariff's requirements "depends on whether the question raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by th[e] Act." *Western Pacific,* 352 U.S. at 65, 77 S.Ct. at 166. It is a question of law, reviewable de novo. *See id.* at 66, 77 S.Ct. at 166. In *Western Pacific,* the Supreme Court decided that construing what constituted an "incendiary bomb" in the applicable tariff raised sufficient questions of policy and fact as to require the case to be

referred to the ICC for its interpretation. *Id.* The reason was that the question involved economic considerations that would not be considered by simply "reading the tariff language or applying abstract 'rules' of construction." *Id.* at 67, 77 S.Ct. at 166. *See also United States v. Chesapeake & Ohio Railway*, 352 U.S. 77, 80–81, 77 S.Ct. 172, 173–174, 1 L.Ed.2d 140 (1956) (remanding to the court of appeals for a determination of whether the case should be referred to the ICC).

■ The primary jurisdiction doctrine does not apply if the ICC has already construed a particular tariff or clarified its underlying factors. *Western Pacific*, 352 U.S. at 69, 77 S.Ct. at 167; *see Crancer v. Lowden*, 315 U.S. 631, 635, 62 S.Ct. 763, 765, 86 L.Ed. 1077 (1942). Nor does it apply if words in the tariff's language are used "in their ordinary sense." *United States v. Atchison, Topeka and Santa Fe Railway*, 725 F.2d 469, 470 (9th Cir.1980), *cert. denied*, 452 U.S. 939, 101 S.Ct. 3081, 69 L.Ed.2d 953 (1981). *See also Great Northern Railway v. Merchants Elevator Co.*, 259 U.S. 285, 291–92, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922). The ICC has never construed the terms of the volume tariff involved in this case, and the parties dispute whether the words of the tariff are used in their ordinary sense.

■ Therefore, this case raises an important threshold question involving the interpretation of the volume tariff. If Yellow Freight is correct about its industry usage argument, then it charged the applicable rate and did not grant a concession. If Yellow Freight is incorrect, however, then the applicable rate was the LTL rate, and granting a lower volume rate was a potential concession even though Yellow Freight was obligated to give Duncan Ceramics the lowest possible rate for which it qualified. *See Hewitt-Robins, Inc. v. Eastern Freight-Ways*, 371 U.S. 84, 86, 83 S.Ct. 157, 158, 9 L.Ed.2d 142 (1962). Under this latter construction of the tariff, Yellow Freight could have satisfied its obligation to give the volume rate to Duncan Ceramics by actually using Chicago as its break

bulk point. This issue of the volume tariff's proper construction is a severable threshold question that must be resolved before determining whether the rate granted in this case constituted a concession, whether Yellow Freight knowingly granted the concession, and whether the Elkins Act applies to motor carriers.

We are sympathetic with the district court's conclusion that the terms of the volume tariff in this case can be construed without help from the ICC concerning transportation policy because the terms appear clear. Reliance on mere facial clarity of the tariff, however, is an insufficient analysis in this case. The disparity between the LTL and the volume rates was presumably designed to serve some rational purpose or purposes. The disparity may have been designed to reflect the relative cost efficiencies of the two shipping methods. More realistically, it may have been designed to allow rough price discrimination between shippers with relatively inelastic demands for transportation services and those with more elastic demands. *See* A. Alchian & W. Allen, *Exchange and Production: Competition, Coordination, and Control* 339–41 (2d ed. 1977) (volume purchasers tend to have more elastic demands, i.e., they have greater incentives and opportunities to substitute cheaper services for a particular industry's more expensive services, and thus they tend to be assessed lower prices to keep their business). Finally, the disparity may have been designed merely to serve special interests—in this case, special interest groups in Chicago that would profit from the breaking of bulk shipments at warehouses in that city.

Construing tariff terms strictly for purposes of establishing whether a *shipper* qualifies for a particular rate would be consistent with the first two policies. But construing them strictly against *carriers* for purposes of actual transportation would serve only the Chicago special interest group policy. It would not serve the cost-matching policy because individual motor carriers are in the best position to determine whether breakbulking in a published

distribution center such as Chicago or in some other location will minimize their costs. Thus, the alleged industry custom arguably would better serve the first policy of matching low rates with low costs. Strict construction against the carrier would have no bearing on the price discrimination policy. It would, however, guarantee a payoff to special interest groups in published distribution points. But it would achieve this transfer of wealth to the favored points at the cost of a net social loss because motor carriers would not be free to seek the most economical transportation route once the rate is established. This net loss serves no one's interest.

The rate bureau negotiation process may result in tariff terms designed to compensate special interest groups for unarticulated concessions made during negotiations by the relevant groups. On the other hand, the Bureau may have intended the terms of this volume tariff to serve solely as standards for shipper rate qualification, leaving carriers free to minimize their costs. This would serve the sound transportation policy of conserving fuel and would tend toward lower rates in the long run. In any case, these are difficult issues of fact and policy inextricably intertwined with the construction of the tariff's terms, and better left to the ICC's special expertise.

The government argues that notwithstanding the reasons for deferring to the ICC on this issue, the court should not defer in this case because it is a criminal rather than a civil case. Although we recognize that care must be taken not to delay unnecessarily a criminal prosecution, this is not an ordinary criminal case. Whether the volume tariff applied to Yellow Freight's services in this case despite Yellow Freight's deviations from the tariff's technicalities is a threshold question of policy which must be decided before the criminal issues can be determined. Thus, it is an appropriate subject for ICC determination pursuant to the primary jurisdiction doctrine.

REVERSED AND REMANDED.