**UNITED STATES of America,
Plaintiff,**

v.

**Floyd W. SEIBERT, a/k/a Martin
Mesquite, and James E. Golden,
Jr., Defendant.**

**No. 4:04 CR 00251 JEG.**

United States District Court,
S.D. Iowa.

Dec. 8, 2005.

Mary C. Luxa, US Attorney's Office, Des Moines, IA, for Plaintiff.

Mack K. Martin, Martin Law Office, J. David Ogle, Ogle & Welch, P.C., Oklahoma, OK, Lawrence F. Scalise, Sullivan & Ward PC, Des Moines, IA, for Defendant.

1. Lara E. Parkin and Frederick Robinson also appeared on Seibert's behalf on December 5,

## ORDER

GRITZNER, District Judge.

This matter comes before the Court on Defendant Floyd W. Seibert's Motion to Dismiss Counts 1 through 9 and 12 of the Superseding Indictment (Clerk's No. 41). The is represented by Mary Luxa. Defendant Seibert is represented by Mack K. Martin.[1] Defendant James E. Golden, Jr., who does not join this motion, is represented by J. David Ogle and Lawrence F. Scalise. Neither party has requested a hearing, and the Court finds no hearing is necessary to resolve the pending motion. The matter is fully submitted and is ready for disposition.

## FACTS

Defendants Floyd W. Seibert and James E. Golden, Jr., have been indicted on charges of health care fraud under title 18 U.S.C. § 1347, criminal conspiracy under title 18 U.S.C. § 371, and making false statements under title 18 U.S.C. § 1001(a)(1) for acts allegedly taken in connection with Medicare-funded health care organizations with which they have been affiliated since 1984. The Government intends to seek the forfeiture of certain properties owned by Seibert if he is convicted. Seibert has moved to dismiss the conspiracy, health care fraud, and forfeiture counts of the Superceding Indictment (Indictment).

## I. MEDICARE REIMBURSEMENT PROCEDURES DURING THE INDICTMENT PERIOD.

Medicare is a federally funded health insurance program for the aged and disabled. Relevant here are procedures utilized under Part A of the Medicare pro-

2005.

gram. Part A is administered by the Center for Medicare and Medicare Services (CMS), a federal agency under the United States Department of Health and Human Services (HHS).[2] Part A provides medical insurance benefits for certain individuals age sixty-five and over and for some individuals under age sixty-five who are entitled to Social Security benefits. *See* 42 U.S.C. § 1395c (2000). Part A helps pay for doctor services, outpatient hospital services, certain home health services, and hospice care. *See id.* To participate in this program, health care providers must enter into a specific type of agreement with the Secretary of HHS (Secretary). *Id.* § 1395cc(a). Thereafter, a provider is eligible to be directly reimbursed for the reasonable cost of services provided to Medicare-eligible patients. *See id.*

A "home health agency" is an organization meeting a number of requirements promulgated by CMS. *See* CMS, Health Agency Manual § 200 (2004), *available at* http://www.cms.hhs.gov/manuals/11_hha/hh200.asp. These requirements are not pertinent here, as it is undisputed that the Defendants were affiliated with organizations qualifying as home health agencies during the indictment period.

CMS fulfills many administrative duties by contracting with third parties. These parties are usually large private insurance companies who serve as fiscal intermediaries. *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, .100 (1995).[3] Fiscal intermediaries reimburse providers for the cost of services incurred on behalf of Medicare beneficiaries. 42 C.F.R. § 421.100(a). In carrying out this function, fiscal intermediaries audit providers' records "as necessary" to ensure proper payments are made. 42 C.F.R. § 421.100(c); *see also* 42 U.S.C. § 1395h(a).

To better understand the context of the Government's allegations, it is necessary to describe how providers were reimbursed by Medicare during the indictment period. Throughout the year, intermediaries made pre-audit "interim payments" to the provider. 42 C.F.R. § 413.64(a), (f)(1). These payments occurred at least monthly. *Id.* § 413.64(a), (f)(1). The amount of the payments were estimates calculated from projections of services the provider was likely to provide.[4] *Id.* § 413.64(e). For home health agencies, payments were based on the number of Medicare-eligible visits billed by the provider multiplied by the cost per visit rate determined from the agency's claims from the previous year. *Id.* § 413.53(a)(3).[5] These payments allowed providers to avoid cash-flow shortages that could follow from delays between the time a service was provided and reimbursement.

---

**2.** CMS was formerly known as the Health Care Financing Administration (HCFA). *See* 42 C.F.R. § 400.200 (2005). Although the events giving rise to the indictment occurred while HCFA was administering the Medicare program, for consistency, HCFA will be referred to as CMS.

**3.** Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in place on May 20, 1996, the date the Government alleges the criminal activity in this case began. *See* Indictment, at 7, ¶ 20; 15, ¶ 2. A number of the regulations cited have since been amended.

**4.** These projections were based on the historic level of Medicare-eligible services provided by the provider (and other adjustments). 42 C.F.R. § 413.64(e).

**5.** This reimbursement method was abandoned by CMS with respect to providers providing home health services in October 2000. *See* 42 U.S.C. § 1395fff. A prospective scheme is now in effect. *See id.* § 1395fff(a); 42 C.F.R. pt. 484, subpt. E (2005).

A reconciliation process began at the end of a provider's fiscal year to determine whether the provider was overpaid or underpaid for its actual costs. The provider submitted a year-end cost report detailing costs incurred for services provided to Medicare-eligible beneficiaries. *Id.* §§ 413.20(b), 413.24. Unless "obvious errors or inconsistencies" were present, the intermediary assumed the report's accuracy and made an "initial retroactive adjustment." *Id.* § 413.64(f)(2).

After reviewing the cost report and requesting additional information, if needed, the intermediary issued a Notice of Program Reimbursement (NPR), indicating the reimbursement due to the provider. *See id.* § 405.1803(a). If the provider was underpaid, the intermediary paid the difference. If the provider was overpaid, the provider either returned that amount or the intermediary adjusted downward (or suspended) the provider's periodic payments for the next year to recover the difference. *See id.* § 405.1803(c). The goal of the process was to "bring the interim payments made to the provider during the [fiscal year] into agreement with the reimbursable amount payable to the provider for the services furnished to program beneficiaries during [the same] period." *Id.* § 413.64(f)(1).

Intermediary decisions were "final and binding" unless an intermediary hearing was requested, the intermediary determination was revised, or a hearing was requested before a Provider Reimbursement Review Board (PRRB). *Id.* § 405.1807; *see also* 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1811 (outlining the procedures for requesting an intermediary hearing), .1835 (explaining how to seek a PRRB hearing), .1885 (describing how an intermediary determination is reopened and revised). Medicare regulations specifically permitted judicial review of PRRB decisions in federal court. *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(a).

Under this scheme, a provider was permitted to do business with individuals or entities under common ownership or control with the provider, known as "related organizations." *See* 42 C.F.R. § 413.17(a). A provider could bill Medicare for goods and services purchased from related organizations but only at the actual cost to the related organizations, so long as "such cost [did] not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere." *Id.* Providers were required to disclose related organizations with which they did business on their yearly cost reports. *Id.* § 413.20(d)(1)(i). No statutory or regulatory provisions put the capability to determine whether organizations were "related" with an intermediary, a PRRB, or CMS.

If a provider's cost report contained false or inflated costs that were not corrected as a result of an audit, a provider could receive interim payments the following year to which it was not entitled. Additionally, if nonallowable expenses were claimed on a cost report, or if a provider failed to disclose the existence of related organizations, a provider's cost of doing business could be artificially inflated. This, in turn, could increase the cost of providing services, increasing interim payments made to the provider the following year.

## II. THE GOVERNMENT'S ALLEGATIONS.

The Government alleges Seibert and Golden conspired to conceal the "related organization" status of certain businesses from the fiscal intermediaries of home health agencies owned by Seibert. According to the Government, Seibert did not disclose in cost reports the related organizations with which his home health agen-

cies did business. The Government also contends Seibert included expenses for related organizations not covered by Medicare on cost reports for some of his home health agencies.

The Government accuses Seibert and Golden of conspiring to create and manage related organizations which supplied goods and services to Seibert's home health agencies at inflated prices. The Government claims Seibert and Golden also conspired to transfer funds from home health agencies and other businesses to an entity unaffiliated with Medicare (operated by Seibert under an alias), which would then "loan" funds back to the home health agencies. The Government contends Seibert would claim "interest payments" for these loans as expenses on his home health agencies' cost reports.

The Government argues that Seibert's submission of cost reports knowing they contained false information and omissions concerning related organizations is health care fraud. Because Golden aided Seibert in key areas, the Government posits the presence of a conspiracy. If Seibert is convicted, the Government intends to seek forfeiture of property and assets Seibert realized through his allegedly fraudulent practices.[6]

## DISCUSSION

Seibert seeks dismissal of Counts 1 through 9 and Count 12 of the Indictment. In Count 1, the Government contends Seibert and Golden conspired from 1996 through 2001 to commit a fraud against the federal government by obtaining money and property by means of materially false and fraudulent misrepresentations in connection with the delivery of and payment for health care benefits, items, and services. In Counts 2 through 9, the Government identifies specific cost reports it claims contained false information and omissions concerning related organizations, amounting to health care fraud.

Seibert points out that for the cost reports referenced in Counts 2 and 3 of the Indictment, the intermediary has issued an NPR.[7] Seibert claims the intermediary has suspended its review of the cost reports referenced in Counts 4 through 9 as a result of a Government request. He has submitted a letter from the United States Department of Justice requesting the intermediary refuse to meet with Golden to discuss these reports.

Seibert argues that review of the cost reports referenced in Counts 2 through 9 of the Indictment is incomplete, and because any intermediary determination is subject to administrative appeal and review by a PRRB, the reports can still be amended or modified. He contends that further review could reveal the cost reports contain no errors, meaning there was no fraud. He argues that if the reports are amended or modified in his favor, the Government cannot prove he engaged in criminal activity.

According to Seibert, the Government's allegations turn on an interpretation of the term "related organizations." Before the

---

**6.** Upon conviction, the Government intends to recover more than $2.7–million in funds Seibert allegedly realized as a result of fraudulent reporting practices, and a ranch in Texas Seibert purchased with such funds.

**7.** Seibert classifies an NPR as "an acceptance of the provider's cost report with minor adjustments." This characterization is not

necessarily true. Even if an intermediary challenges the amount in a cost report, the intermediary must still issue an NPR. *See* 42 C.F.R. § 405.1803(a). There is also no regulation requiring "minor adjustments" when an NPR is issued. Finally, Seibert has not submitted evidence that any NPR in this case contained only "minor adjustments."

Government prosecutes him, Seibert claims he should be permitted to have that term interpreted through the administrative appeal process. Therefore, Seibert concludes, the Government has executed an unallowable "preemptive strike" by initiating a criminal prosecution, preventing him from pursing an administrative review of the cost reports.

Seibert's argument distills to three components. First, arguing that the "basis ... underlying the [S]uperseding Indictment is the interpretation of the meaning of the phrase 'related organizations,' " Seibert claims he is "entitled to have that issue subject to review by administrative review" before the Government can prosecute him. Second, Seibert contends dismissal is proper because "administrative review by the PRRB is the exclusive remedy of the government." The core of this argument is that because Seibert can seek a review of any dispute related to the cost reports solely through administrative channels, the Government should be required to do the same. Third, Seibert argues dismissal is proper because he has not exhausted his administrative remedies by following the review of his cost reports to their conclusion. Seibert contends that the Government's initiation of criminal proceedings prevents him from exercising his right to have his cost reports reviewed.[8] These arguments are addressed in turn.

## I. PRIMARY JURISDICTION.

### A. Categorizing Seibert's Argument.

■ Primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (*Western Pacific*). The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 64, 77 S.Ct. 161; *accord Great Plains Coop v. Commodity Futures Trading Comm'n*, 205 F.3d 353, 355 (8th Cir.2000); *see also Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (recognizing that primary jurisdiction applies to claims "contain[ing] some issue within the special competence of an administrative agency"). The goal is to prevent the scenario where "a court and an administrative body ... might rule in the opposite manner from the other in different suits involving similar facts." *United States v. Alaska S.S. Co.*, 110 F.Supp. 104, 107 (W.D.Wash. 1952).

■ If an agency has primary jurisdiction over a matter, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *Western Pacific*, 352 U.S. at 64,

8. Seibert notes that the Government has asked one intermediary to refuse to meet with Golden regarding cost reports pertaining to one of Seibert's organizations. He has submitted a letter authored by an attorney at the Department of Justice to that effect. This letter is immaterial for three reasons. First, the Department of Justice did not ask the intermediary to suspend its review; it merely asked the intermediary to not seek additional information as part of its review. Second, the remedy Seibert seeks is dismissal of specific counts of the Indictment, not the removal of a Government-requested suspension of the review of Seibert's cost reports. Finally, the Department of Justice did not ask the intermediary to refuse to meet with Seibert's attorney; it only asked the intermediary not to meet with Golden. In any event, Seibert has not submitted any evidence that the intermediary has complied with the Government's requests.

77 S.Ct. 161 (citing *Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 84 L.Ed. 361 (1940)); *see also Reiter*, 507 U.S. at 268, 113 S.Ct. 1213 (primary jurisdiction "requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties [a] reasonable opportunity to seek an administrative ruling."). An agency's exercise of "[p]rimary jurisdiction permits a court to dismiss or stay an action in deference to a parallel administrative agency proceeding." *United States v. Henderson*, 416 F.3d 686, 691 (8th Cir. 2005) (citing *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1456 (8th Cir.1995)); *accord Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir.2005).

Seibert contends that "giving the agency the opportunity for first review is the exclusive and rational remedy" of the Government when investigating claimed misrepresentations and omissions in his cost reports because "[t]he actions which are the subject of the indictment have not been subject to review, revision, application, and interpretation by the agency" and because "there has been no agency determination of the interpretation of the rules and/or issues concerning the 'related organization[s]'" that are the subject of the Indictment. These statements awkwardly argue that this Court should bar Seibert's prosecution until an agency has interpreted the words "related organization" as applied to the organizations the Government claims are related. In other words, Seibert asks the Court to prevent his prosecution until the parallel agency procedures have run their course. This is, at bottom, a primary jurisdiction argument.

**B. Analysis.**

■ Application of the primary jurisdiction doctrine is determined on a case-by-case basis. *Access Telecomm. v. Sw.*

*Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998); *see also Western Pacific*, 352 U.S. at 64, 77 S.Ct. 161 ("No fixed formula exists for applying the doctrine of primary jurisdiction."); *Alpharma*, 411 F.3d at 938 ("The contours of primary jurisdiction are not fixed by a precise formula."). The doctrine is exercised in "rare case[s]" implicating an agency's "expert consideration," *Alpharma*, 411 F.3d at 939, "special competence," *Great Plains Coop*, 205 F.3d at 356 (*dicta*), or "special expertise," *De-Bruce Grain, Inc. v. Union Pac. R. Co.*, 149 F.3d 787, 789 (8th Cir.1998); *see also Access Telecomm.*, 137 F.3d at 609 (noting that when becoming "embroiled in the technical aspects of" a regulation it became necessary "to draw upon the [agency]'s expertise and experience").

■ Whether an agency has primary jurisdiction over a matter "depends on 'whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application.'" *Alpharma*, 411 F.3d at 938 (quoting *Western Pacific*, 352 U.S. at 64, 77 S.Ct. 161). Resolution of that question typically "requires a careful examination of the [relevant] statutory scheme." *Jackson*, 53 F.3d at 1456. Reasons a court could defer to an agency include "the promotion of consistency and uniformity within the areas of regulation and the use of the agency expertise 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion.'" *Alpharma*, 411 F.3d at 938 (quoting *Access Telecomm.*, 137 F.3d at 608 (quotation marks and citation omitted)); *accord Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *United States v. Radio Corp. of Am.*, 358 U.S. 334, 346, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); *Western Pacific*, 352 U.S. at 64, 77 S.Ct. 161; *see also*

*Henderson,* 416 F.3d at 691 (listing the purposes of the doctrine as including the "promot[ion of] uniformity, consistency, and the optimal use of the agency's expertise and experience"). Referral to an agency is also appropriate where "a prior agency adjudication of [the] dispute will be a material aid in ultimately deciding" the issue. *Ricci v. Chicago Mercantile Exch.,* 409 U.S. 289, 305, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

▇ The Government notes that the primary jurisdiction doctrine "should be used sparingly, particularly where Congress has decided that the *courts* should consider an issue." *Henderson,* 416 F.3d at 691 (emphasis added). This Court has jurisdiction to hear criminal matters, and the genesis of that authority is an act of Congress. *See* 18 U.S.C. § 3231. Additionally, a "careful examination" of the relevant statutes and regulations identifies no provision relegating a determination of whether two organizations are "related" to an administrative agency. *See Jackson,* 53 F.3d at 1456. "Only where an issue unambiguously requires initial agency determination under the primary jurisdiction doctrine, and the referring court has the authority to review the agency's order, can the agency's regulatory interests be required or allowed to subordinate the government's authority to prosecute criminal offenses." *United States v. Gen. Dynamics Corp.,* 828 F.2d 1356, 1366 (9th Cir. 1987). Here, no statute or regulation recommends, much less "unambiguously requires," referral to an administrative body of the question of whether any organizations here are related. *Id.*

Additionally, Seibert has pointed to no authority authorizing the Court to stay a criminal prosecution while an agency analyzes his cost reports. In fact, while upholding a conviction over a primary jurisdiction argument, our circuit recently noted that the defendant "cite[d] no statute or precedent that entitles a defendant to an administrative resolution before a criminal prosecution (even if a defendant might obtain a favorable agency decision)." *Henderson,* 416 F.3d at 691. Seibert's motion is similarly devoid of authority on the point.

Situations where primary jurisdiction has been applied to stay or dismiss pending criminal actions do, however, exist. *E.g., United States v. Yellow Freight Sys., Inc.,* 762 F.2d 737 (9th Cir.1985); *U.S. v. Alaska S.S.,* 110 F.Supp. 104 (W.D.Wash. 1952); *see also Gen. Dynamics,* 644 F.Supp. 1497, 1503 (C.D.Cal.1986) (collecting cases), *rev'd,* 828 F.2d 1356; *United States v. Am. Union Transp., Inc.,* 232 F.Supp. 700, 702 (D.N.J.1964) (collecting cases); *cf. Sprint Corp. v. Evans,* 846 F.Supp. 1497, 1507–09 (M.D.Ala.1994) (referring issues to the FCC in an attempt by a telecommunications corporation to enjoin criminal prosecution under a state anti-obscenity statute). For example, in *United States v. Alaska Steamship Co.,* the government initiated civil and criminal actions against a corporation and five of its officers for conduct it alleged amounted to violations of antitrust statutes. *Alaska S.S.,* 110 F.Supp. at 104–05. The defendants moved to dismiss or, alternatively, to stay criminal proceedings against them, arguing the Federal Maritime Board should be permitted to decide pending matters prior to the initiation of the government's action, particularly because of the intersection between the government's claims and the Shipping Act of 1916. *Id.* at 106. The court agreed, holding that allegations amounting to claimed violations of the Shipping Act must first be resolved by the Board. *Id.* at 107–11. Relying on principles of primary jurisdiction, the court dismissed the civil and criminal actions. *See id.* at 111. The court refused to draw

a distinction between the doctrine's application in civil and criminal cases. The court ruled that "[a]ll the arguments in favor of letting an experienced administrative board exercise its primary jurisdiction applies with equal force in a criminal case as in a civil case. The rationale applicable to the two types of action [sic] is the same." *Id.*

The doctrine was also invoked to reverse a conviction in *United States v. Yellow Freight System, Inc.,* There, the defendant freight carrier argued it did not violate either the Elkins Act or the Motor Carriers Act because, it argued, the Interstate Commerce Commission (ICC) would have recognized its practices as sound policy. *Yellow Freight Sys.,* 762 F.2d at 739. The defendant asserted that the district court should have transferred the matter to the ICC. *Id.* Recognizing that the ICC had not construed the tariff at issue, and noting that the parties disputed how to interpret the tariff, the court held that a "threshold question" had not been resolved, rendering the district court's refusal to transfer the case improper. *Id.* at 740–41; *see also Gen. Dynamics,* 828 F.2d at 1373 (Brunetti, J., dissenting) (analogizing *General Dynamics* to *Yellow Freight,* and reasoning that whether the defendant's practices were proper constituted a "threshold question of policy and uniform administration").

The *Yellow Freight* court did note that case before it was "not an ordinary case" because of the need to resolve policy questions related to the tariff's technicalities before the criminal issues could be determined. *Yellow Freight,* 762 F.2d at 741. Here, there are no threshold policy questions to be resolved before deciding whether Seibert engaged in criminal conduct. Whether the organizations Seibert operated are "related" is not a policy question, and appears unlikely to have an impact on the Medicare regulatory scheme beyond this case.

Relying in part on *Alaska Steamship,* the District Court for the District of Columbia noted that even "though the doctrine of primary jurisdiction may be applied to both civil and to criminal actions, it is more forceful in the civil regulatory type actions than in criminal actions for in the latter actions the violations of other federal statutes may more often be involved, and the regulatory scheme less affected." *In re Grand Jury Investigation of the Shipping Indus.,* 186 F.Supp. 298, 309 (D.D.C.1960). Here, Seibert was not indicted because he violated a Medicare regulation; he was indicted because the Government contends he engaged in conduct amounting to a violation of a criminal statute. The doctrine's operation is further blunted by the reality that "its use clearly interferes with the Government's authority to prosecute criminal cases," primarily because of "the possibility that issues central to the criminal prosecution will be determined in another forum." *Gen. Dynamics,* 828 F.2d at 1366 & n. 17; *see also id.* ("Requiring the government to litigate issues central to a criminal prosecution in collateral agency proceedings is at odds with the general rule of prosecutorial discretion over the bringing of criminal indictments.").

The Government directs the Court to the First Circuit's opinion in *United States v. Alemany Rivera,* where the defendants made arguments remarkably similar to Seibert's. *See United States v. Alemany Rivera,* 781 F.2d 229, 231–33 (1st Cir. 1985). The defendants were convicted of a number of offenses, among them submitting false Medicare cost reports. *Id.* at 231. The government successfully contended "that the cost reports falsely represented to HHS's fiscal intermediaries ... that none of the costs for which the [pro-

vider] sought reimbursement resulted from transactions with related organizations ... when a number of expenses included in the cost reports" involved such transactions. *Id.* at 231–32 (quotation marks omitted). On appeal, the defendants argued that charges related to the cost reports should have been dismissed because neither HHS nor an intermediary found the organizations were related. *Id.* at 232.

> Both defendants contend[ed] that, because the Medicare Regulations provide that, in the event of a question, a determination of whether a provider has acquired supplies or services from a related organization is to be made in the first instance by an intermediary, and the provider then has a right of appeal to a [PRRB], the district court was without jurisdiction to decide whether, contrary to the representations in the cost reports, the [provider] was 'related to' [the purported related organization].

*Id.* (citations omitted). This is precisely Seibert's argument.

The First Circuit reasoned that "the district court's jurisdiction ... was predicated on allegations that the defendant had violated a criminal statute," making the court's exercise of jurisdiction proper because the court "did not usurp HHS's primary, civil jurisdiction over any claims made ... for reimbursement." *Id.* at 232–33 (citations omitted). While the court recognized that whether the organizations were related "would, of course, bear on" whether the defendants had the requisite criminal intent to sustain a conviction, that did not make the district court's exercise of jurisdiction improper. *Id.* at 233. In fact, the court noted that if evidence showing the organizations were related "was sufficiently questionable, the defendants could not be held criminally accountable." *Id.* Unlike *Alemany Rivera*, there has not yet been a trial. However, Seibert may present evidence at trial that information contained in his cost reports contained no false or misleading information.[9]

The Government also directs the Court to *United States v. Culliton*. There, a defendant was convicted for making false statements on a medical form submitted to the FAA. *United States v. Culliton*, 328 F.3d 1074, 1076 (9th Cir.2003), *cert. denied*, 540 U.S. 1111, 124 S.Ct. 1087, 157 L.Ed.2d 900 (2004). The defendant argued, *inter alia*, that the primary jurisdiction of the FAA deprived the district court of jurisdiction over his indictment unless and until the agency revoked his medical certification. *Id.* The court disagreed, recognizing that "although the FAA has the competence to deal with false statements on its applications[, that] does not mean that Congress has conferred upon it *sole* responsibility to penalize false statements, thereby suspending the operation of a criminal statute of general application." *Id.* at 1082 (emphasis added). The court ruled that "while the FAA is competent to determine whether an applicant has made false statements on a certificate form, it is squarely within the province of the Department of Justice to prosecute felonies of perjury and false statements." *Id.*

Here, the cost report appeal scheme demonstrates competence to interpret and apply Medicare regulations exists in bodies

---

9. Contrary to Seibert's allegations, the Government is not "dictating what is fraud." Mot. to Dismiss, at 7. A jury will perform that role. Additionally, the Government is not "dictating ... what are the rules, regulations, policies and interpretations of the agency, without any agency input, discussion or review." *Id.* Seibert appears to discount the reality that he may mount a defense at trial; he can attempt to persuade a jury that the organizations at issue were not related.

other than federal courts. However, like the defendant in *Culliton*, Seibert has failed to "point to anything in the pertinent statutory or regulatory framework that prevents the Department of Justice from prosecuting" him. *Id.* at 1082.

In fact, courts have had little trouble discerning when organizations are "related," illustrating that interpreting that term is well within the competence of the judiciary.[10] *See, e.g., Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 509, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Sid Peterson Mem'l Hosp. v. Thompson*, 274 F.3d 301, 309–11 (5th Cir.2001); *Monongahela Valley Hosp., Inc. v. Sullivan*, 945 F.2d 576, 591–92 (3d Cir.1991); *N. Iowa Med. Ctr. v. Dep't of Health & Human Servs.*, 196 F.Supp.2d 784, 788–94 (N.D.Iowa 2002). Juries have convicted individuals in analogous factual settings, illustrating the term is also not beyond their interpretive abilities. *E.g., United States v. Gupta*, 363 F.3d 1169, 1170–71 & n. 1 (11th Cir.2004); *Alemany Rivera*, 781 F.2d at 231–32. Moreover, Medicare regulations define what a "related organization" is: "Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies." 42 C.F.R. § 413.17(b)(1). "Related to the provider", "common ownership", and "control" are all defined terms. *See id.* § 413.17(b)(1)-(3);

*see also Alpharma*, 411 F.3d at 939 (interpreting "the meaning of agency publications in the Federal Register and Code of Federal Regulations ... is well within the 'conventional experience of judges.'" (quoting *Access Telecomm.*, 137 F.3d at 608)). Medicare regulations even provide examples of organizations that would be related. *See* 42 C.F.R. § 413.17(c).

In an analogous case, our circuit recently discussed the primary jurisdiction doctrine where a defendant appealed her conviction of wire fraud, concealment from the Social Security Administration (SSA), and making false statements to the SSA. *Henderson*, 416 F.3d at 690. The defendant sought and received social security disability income (SSDI), but competed in (and won) beauty pageants, worked at her husband's business, operated two businesses from her home, and told a physician she had no significant past or present illnesses. *Id.* On appeal, the defendant argued, *inter alia*, that the district court should have deferred her case to the SSA "because SSDI eligibility is a complicated, regulatory issue requiring agency expertise." *Id.* at 691. The Eighth Circuit disagreed, holding that the jury was not asked to determine whether the defendant was eligible, but would only "decide whether she misrepresented or omitted material facts." *Id.* The jury here will not be asked to determine labyrinthine questions of

---

10. The Government argues that an interpretation of the term is a task the Court should not and a jury will not undertake. Specifically, it argues that "the [I]ndictment [does] not require the jury or this court to make a determination as to the related party status of Seibert's home health agencies and his other entities. The issue confronting the jury will be whether the defendant knowingly made false representations on his cost reports by concealing the existence of the other entities." Resistance, at 10. According to the Government, the issue will not be whether any entities are related, but whether Seibert

concealed their existence in his cost reports. Although a creative argument, it overlooks the fact that many of the Government's allegations assume that some organizations are related. *See, e.g.,* Indictment, at 8, ¶¶ 21, 23–24; 13, ¶ 27(w)-(x), 27(aa); 15, ¶¶ 3–4; 16, ¶¶ 5–6. As Seibert has not conceded that any of organizations referenced in the Indictment are related, that determination may ultimately be required, particularly since the crime the Government contends Seibert committed involved the knowing concealment of the "related organization" status of a number of the entities in question.

whether claims made by Seibert were reimbursable; it will only be asked to determine whether Seibert's cost reports contained false or misleading information. Although part of that decision-making process may very well include a determination of whether some of the organizations mentioned in the indictment are "related", that process is not operose.

The expertise and policymaking abilities of an agency are not needed to decide whether any organizations referenced in the Indictment are related, insofar as that determination affects whether Seibert knowingly concealed their related status. Additionally, because the pending action is criminal, the Court is particularly reluctant to apply the primary jurisdiction doctrine to stay (or dismiss) this prosecution. Consequently, Seibert's Motion to Dismiss, insofar as it is premised on a primary jurisdiction argument, must be denied.

## II. EXCLUSIVITY OF ADMINISTRATIVE REMEDIES.

Relying solely on *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000), Seibert also argues that "administrative review by the PRRB is the exclusive remedy of the government." The Government responds by arguing that administrative channels are not the exclusive remedy of the Government for criminal conduct. Distinguishing *Illinois Council*, the Government contends that an incomplete administrative review of contested cost reports does not bar criminal prosecutions.

In *Illinois Council*, members of a trade association of nursing homes brought a pre-enforcement challenge in federal court to certain CMS regulations for nursing homes. *Id.* at 6–7, 120 S.Ct. 1084. The plaintiffs argued that these regulations violated both statutory and constitutional provisions and urged the district court to exercise jurisdiction under title 28 U.S.C. section 1331. *Id.* at 5, 7, 120 S.Ct. 1084. The *Illinois Council* Court considered whether title 42 U.S.C. section 405(h), made applicable to the Medicare Act by title 42 U.S.C. section 1395ii, barred a district court from exercising jurisdiction under title 28 U.S.C. section 1331. *Id.* at 5, 120 S.Ct. 1084.[11] Section 405(h) "channels" most challenges through the administrative appeals process instead of allowing them to be brought directly in federal district court. *See id.* at 8, 120 S.Ct. 1084.

The *Illinois Council* Court noted two jurisdictional routes through which the plaintiffs might have brought their claims. *See id.* at 7–9, 120 S.Ct. 1084. The route chosen was federal-question jurisdiction under title 28 U.S.C. section 1331. *Id.* at 7, 120 S.Ct. 1084. The alternative route, title 42 U.S.C. section 1395cc(h)(1)(A), incorporates the review procedures of title 42 U.S.C. section 405(g). *See id.* at 7–9, 120 S.Ct. 1084.

The Court recognized that the section 405(h) bar "clearly appl[ied]" if an individual challenged the denial of Medicare benefits, "irrespective of whether the individual challenges the agency's denial on evidentiary, rule-related, statutory, consti-

---

**11.** Section 405(h) provides that "[n]o action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter." 42 U.S.C. § 405(h). Section 405(h) purports to make exclusive judicial review procedures in title 42 U.S.C. section 405(g). *See id.* § 405(g), (h). The original text of sections 405(g) and (h) refer to the "Commissioner of Social Security" rather than the Secretary. The statutory provisions making section 405(h) applicable to the Medicare Act, however, make clear that references to the Commissioner should be treated as references to the Secretary when the context indicates. *See* 42 U.S.C. § 1395ii, 1395cc(h)(1)(A).

tutional, or other grounds." *Id.* at 10, 120 S.Ct. 1084. This holding is irrelevant here because it does not prevent the *Government* from enforcing a criminal statute, it merely requires individuals to exhaust administrative procedures before bringing actions in federal court. The more difficult case, and the fighting issue in *Illinois Council,* was whether section 405(h) applies if "one who *might* later seek money or some other benefit from (or contest the imposition of a penalty by) the agency challenges in advance (in a § 1331 action) the lawfulness of a policy, regulation, or statute that *might* later bar recovery of that benefit (or authorize the imposition of the penalty)." *Id.* This situation is also irrelevant because Seibert's conduct has no *prospective* aspect. It occurred in the past. Moreover, Seibert is not challenging a policy, regulation, or rule HHS or CMS created. He is instead arguing this criminal prosecution is premature. Therefore, regardless of how the *Illinois Council* Court resolved the question presented before it, resolution of that question does not aid Seibert.

 In any event, the Court ruled section 1395ii does not apply section 405(h) (thereby permitting jurisdiction under section 1331) if section 405(g) review "would mean no review at all." *Id.* at 19, 120 S.Ct. 1084 (construing *Bowen v. Mich. Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)). The Court recognized "that ' "a serious constitutional question" . . . would arise if

[it] construed § 1395ii to deny a judicial forum for constitutional claims. . . .' " *Id.* at 17, 120 S.Ct. 1084 (quoting *Mich. Academy,* 476 U.S. at 681 n. 12, 106 S.Ct. 2133, in turn quoting *Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). Thus, the only exception to section 405(h) is if an administrative decision is not subject to further review. The plaintiffs' claims in *Illinois Council* failed to fit into that narrow exception.[12]

Even if Seibert asserted his case fits into the *Illinois Council* exception (which he has not), that argument would be unavailing because title 28 U.S.C. sections 1331 and 1346 are only implicated in civil cases, and even then, only by non-governmental plaintiffs. In sum, *Illinois Council* is utterly unhelpful to Seibert's position.

 *Illinois Council* aside, the Government notes section 405(h) applies to civil actions brought *against* the United States under title 28 U.S.C. sections 1331 or 1346. *See* 42 U.S.C. § 405(h) (providing that "[n]o action *against* the United States, the [Secretary], or any officer or employee thereof shall be brought under sections 1331 or 1346 of title 28"). This action is a criminal action brought *by* the United States. Jurisdiction therefore rests upon title 18 U.S.C. section 3231. *See* 18 U.S.C. § 3231. While it remains true that most individuals contesting a determination that they are not compliant with Medicare regulations must present their cases "to the agency prior to review

---

**12.** Post-*Illinois Council* courts have recognized this exception is limited to the method HHS uses to compute benefits, and not to amount determinations. *See, e.g., BP Care, Inc. v. Thompson,* 398 F.3d 503, 512 (6th Cir.2005); *Furlong v. Shalala,* 238 F.3d 227, 233 (2d Cir.2001). The distinction between "methodology" cases and "amount determination" cases is "somewhat unclear," but is irrelevant to the case at bar. *Furlong,* 238 F.3d at 233–34. Plaintiffs successfully apply-

ing the exception to the rule, are, unironically, the exception rather than the rule. *E.g., Buchanan v. Apfel,* 249 F.3d 485, 490 (6th Cir.2001); *see also Binder & Binder PC v. Barnhart,* 399 F.3d 128, 131 (2d Cir.2005) (conjecturing that if the plaintiff's claims were conceived of as being commenced under the Social Security Act (an unclear question there), section 1331 jurisdiction "may be available" under the *Illinois Council* exception to the section 405(h) bar).

in federal court," *Illinois Council*, 529 U.S. at 24, 120 S.Ct. 1084, that rule is not applicable to criminal actions commenced by the government.

Cases interpreting *Illinois Council* buttress this conclusion. For example, in *United States v. Tenet Healthcare Corp.*, the court considered whether section 405(h) barred the government from recouping overpayments where no determination by an agency had been made that an overpayment had occurred. *United States v. Tenet Healthcare Corp.*, 343 F.Supp.2d 922, 926–27 (C.D.Cal.2004). The defendants argued the government could only proceed within the administrative scheme. *Id.* at 927. Relying on two cases and distinguishing a third (which has since been overruled), the court disagreed. *See id.* at 927–31 (discussing *United States v. Rogers*, No. 1:97CV461, 2001 WL 818160 (E.D.Tenn. June 28, 2001), and *United States ex rel. Body v. Blue Cross & Blue Shield*, 156 F.3d 1098 (11th Cir.1998), and distinguishing *United States v. Univ. of Mass. Mem'l Med. Ctr.*, 296 F.Supp.2d 20 (D.Mass.2003), *overruled by United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 7 n. 4 (1st Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 339, 163 L.Ed.2d 51 (2005)); *cf. United States v. Medica–Rents Co.*, No. Civ. A. 4:00–CV–483–Y, 2005 WL 723749, at *3 (N.D.Tex. Mar.29, 2005) (holding that the government is not required to proceed under the Medicare statutory and administrative scheme prior to bringing common law causes of action for unjust enrichment and payment by mistake).

The court relied on *Rogers* and *Body* for the proposition that section 405(h) applies *only* if both standing to assert the claim and the substantive basis for the claim "arose under" the Medicare Act. *See Tenet Healthcare*, 343 F.Supp.2d at 927–28. In *Rogers*, the government's action rested upon the False Claims Act and other common law principles, and thus did not "arise under" the Medicare Act. *Rogers*, 2001 WL 818160, at *21–*22. *Body* involved claims by the government under the False Claims Act, so that act provided both standing and a substantive basis for the government's claim. *Body*, 156 F.3d at 1100, 1104 & n. 11, 1105–06, 1110. These cases provided guidance to the *Tenet* court, which concluded that "because the government's action [was] predicated on the submission of inaccurate and misleading claims, the common law, not the Medicare Act, provide[d] both standing and the substantive basis for the claim." *Tenet Healthcare*, 343 F.Supp.2d at 928. The court construed *Illinois Council* as addressing "only the statutory limits placed on the ability of providers to challenge agency determinations in federal court before obtaining an administrative determination on the provider's claim for reimbursement." *Id.* Consequently, *Illinois Council* had no bearing on the *Body* court's conclusion that section 405(h) sought only " 'to preserve the integrity of the administrative process Congress designed to deal with challenges ... by dissatisfied [providers and beneficiaries],' and is therefore inapplicable to claims brought on behalf of the government to recover overpayments." *Tenet Healthcare*, 343 F.Supp.2d at 931 (quoting *Body*, 156 F.3d at 1109, 1110) (alteration and omission by the *Tenet Healthcare* court).

In another civil case, the defendant claimed the district court should not have exercised jurisdiction over the government's claims because title 42 U.S.C. sections 405(g) and (h) prohibited it from recovering in a direct action in federal court. *Lahey Clinic Hosp.*, 399 F.3d at 3, 6. He asserted the decision to reimburse him was a final decision which could only be reopened administratively. *Id.* The First Circuit framed the defendant's argu-

ment as one that "assume[d] . . . that the Medicare Act is the *only* avenue available to the United States to recover Medicare overpayments and that the Act repeals the grant of federal court jurisdiction under § 1345." *Id.* at 8 (emphasis added). This argument rested on the assumption "that the initial payment decision to reimburse [the defendant] for the tests [was] 'a decision of the Secretary' and § 405(h) makes § 405(g) the *exclusive* avenue for judicial review of this decision, regardless of whether the plaintiff is the United States or a dissatisfied beneficiary or provider." *Id.* at 11.

Instead of seeking a review of an administrative decision, the court noted that "[t]he United States [was] not asking the federal courts to review a decision of the Secretary, it [was] bringing an independent action to establish the United States' right to obtain restitution of monies wrongfully paid from the public fisc." *Id.* at 12. The court held that the district court properly proceeded with the government's claims. *Id.* at 4.

■ Although *Lahey Clinic* and *Tenet Healthcare* were civil actions, and this action is a criminal one, the same reasoning applies at bottom in both settings, if not more starkly in the criminal area. Sections 405(h) and (g) are designed to force plaintiffs to exhaust their administrative appeals before suing the government in federal court for disputes arising under the Medicare Act. Section 405(g), by its terms, applies only to actions brought *against* the government, and also applies only to claims "arising under" the Medicare statutes. This bar does not require the government to seek an administrative remedy before prosecuting.

■ The administrative appeal process is not the "exclusive" vehicle by which the Government can proceed. To the extent Seibert's motion to dismiss is predicated on the argument that the Government must seek a remedy through the administrative appeals process before prosecuting him, it must be denied.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES.[13]

■ Finally, Seibert argues that the Government must allow him to exhaust his administrative appeals regarding his cost reports before prosecuting him.[14]

---

**13.** There is a logical inconsistency between Seibert's position on the one hand that the Court should defer to an administrative agency to interpret the regulations at stake, and, on the other hand, require the Government to exhaust any administrative remedies. *See Jackson*, 53 F.3d at 1455–56 (noting that litigants "often confuse[ ]" the exhaustion requirement with the primary jurisdiction). Primary jurisdiction "applies where a claim is originally cognizable in the courts." *Western Pacific*, 352 U.S. at 64, 77 S.Ct. 161; *see also Jackson*, 53 F.3d at 1456. " 'Exhaustion' applies where claim is cognizable in the first instance by an administrative agency alone." *Western Pacific*, 352 U.S. at 63, 77 S.Ct. 161; *see also Jackson*, 53 F.3d at 1456. *See generally Reiter*, 507 U.S. at 268–70, 113 S.Ct. 1213 (providing an example of a case where a party purportedly sought relief under one theory, while actually seeking the remedy provided by

the other). Seibert does not couch these as alternative arguments. Reconciliation of this logical contradiction is unnecessary, however, because the argument fails either way.

**14.** There are two exhaustion concepts. The first is a statutory requirement that is a jurisdictional prerequisite, and the second is a discretionary consideration that has no impact on a court's exercise of jurisdiction. *See McCarthy v. Madigan*, 503 U.S. 140, 144–46, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), *superceded on other grounds*, 42 U.S.C. § 1997e; *see generally White & Case LLP v. United States*, 67 Fed.Cl. 164, 170–71 (Fed.Cl.2005) (providing an outline of the requirements for "prudential exhaustion"). By arguing that the Government must adhere to the administrative review procedure outlined in relevant Medicare regulations, Seibert appears to rely on the former.

 " 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course," *Western Pacific*, 352 U.S. at 63, 77 S.Ct. 161, and "allow[s] an agency 'greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts,' " *Tenet Healthcare*, 343 F.Supp.2d at 935 (quoting *Illinois Council*, 529 U.S. at 13, 120 S.Ct. 1084). However, if "the government itself 'decides to pursue a judicial remedy, the exhaustion of remedies doctrine is simply not applicable.' " *Tenet Healthcare*, 343 F.Supp.2d at 935 (quoting *United States v. Paternostro*, 966 F.2d 907, 912 (5th Cir.1992)); *cf. Paternostro*, 966 F.2d at 912 (holding that an agency is not required to exhaust administrative remedies before it seeks a judicial remedy). For example, in *FTC v. Singer*, the defendants argued the FTC should have conducted administrative proceedings before seeking to enjoin the defendants from violating certain anti-fraud rules and seeking redress for victims of an allegedly fraudulent scheme. *FTC v. Singer*, 534 F.Supp. 24, 26–27 (N.D.Cal.1981), *aff'd* 668 F.2d 1107 (9th Cir.1982). The court held that the exhaustion requirement "involve[d] procedures an *individual* must utilize to challenge the enforcement of an agency rule against him," *id.* (citing *Moore v. N.Y. Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926)) (emphasis added), and "ha[d] no application to the exercise by a governmental agency of its prosecutorial discretion to enforce the law," *id.* (citing *FTC v. Universal Rundle Corp.*, 387 U.S. 244, 251, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967)).

Here, the Government need not wait for Seibert to exhaust his administrative appeals because the exhaustion requirement is only applicable to individuals appealing administrative rulings. The Court cannot interfere with the Government's choice to initiate a criminal prosecution on this ground.

## CONCLUSION

Having disposed of the three bases of Seibert's Motion to Dismiss (Clerk's No. 41) in the foregoing discussion, the Court concludes his motion must be denied.

**IT IS SO ORDERED.**